990 F.2d 711
 36 ERC 1321, 61 USLW 2635, 82 Ed. Law
Rep. 321,
23 Envtl. L. Rep. 20,706
 UNITED STATES of America; State of New York, Plaintiffs-Appellees,
v.
ALCAN ALUMINUM CORPORATION,
Defendant-Third-Party-Plaintiff-Appellee-Cross-Appellant,
v.
CORNELL UNIVERSITY, Third-Party-Defendant-Appellant-Cross-Appellee.
 Nos. 403, 530, Dockets 92-6158, 92-6160.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 9, 1992.
Decided April 6, 1993.
 
 Lawrence A. Salibra, II, Cleveland, OH (John C. Tillman, of counsel), for defendant-third-party-plaintiff-appellee-cross-appellant Alcan Aluminum Corp.
 Thomas Mead Santoro, Ithaca, NY (Patricia A. McClary, on the brief), for third-party-defendant-appellant-cross-appellee Cornell University.
 John T. Stahr, Washington, DC (Anne S. Almy, Henry Friedman, Dept. of Justice, Environment and Natural Resources Division, Bernice Corman, Carol Berns, Joan Gillespie, Charles De Saillan, Charles Breece, U.S. E.P.A., David A. Munro, Asst. Atty. Gen., Vicki A. O'Meara, Acting Asst. Atty. Gen., State of New York, of counsel), for plaintiffs-appellees U.S., State of NY.
 O. Peter Sherwood, Corp. Counsel, New York City (Peter H. Lehner, Christopher A. Amato, Environmental Law Div., of counsel), filed a brief on behalf of the City of New York as amicus curiae.
 Norman W. Bernstein, Washington, DC (Donald B. Mitchell, Jr., Lawrence E. Blatnik, Arent Fox Kintner Plotkin & Kahn, of counsel), filed a brief on behalf of Exxon Chemical Co., Ford Motor Co., Allied-Signal, Inc., Carrier Corp., General Motors Corp., Pratt & Whitney, and USX Corp. as amicus curiae.
 Robert B. Weintraub, New York City (Michael Stanley, Oswego, NY, of counsel), filed a brief on behalf of the Greater Oswego Chamber of Commerce, Inc. as amicus curiae.
 Robert B. Weintraub, New York City (Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, DC, of counsel), filed a brief on behalf of the Chamber of Commerce of the U.S. of America as amicus curiae.
 Robert B. Weintraub, New York City, filed a brief on behalf of New York State Ins. Ass'n as amicus curiae.
 Austin V. Campriello, Werner & Kennedy, New York City (Mahlon C. Schneider, Austin, MN, Kevin Montano, Bethesda, MD, of counsel), filed a brief on behalf of Geo. A. Hormel & Co., Marriott Corporation's Food Service Div., The National Food Processors Ass'n and Burger King Corp. as amici curiae.
 Doren P. Norfleet, Oswego, NY, filed a brief on behalf of Operation Oswego County, Inc. as amicus curiae.
 Thomas O'Brien, Jeffrey & O'Brien, P.C., Clinton, NY, filed a brief on behalf of Various Individuals Who Represent a Cross-Section of the Metropolitan Area of Utica, New York as amicus curiae.
 James R. Griffith, Felt, Hubbard & Bogan, Utica, NY, filed a brief on behalf of New York State Conference of Mayors and Mun. Officials as amicus curiae.
 Alan S. Burstein, Scolaro, Shulman, Cohen, Lawler & Burstein, P.C., Syracuse, NY, filed a brief on behalf of School Districts as amici curiae.
 Robert B. Weintraub, New York City (Gay Williams, Sullivan & Williams, Oswego, NY, of counsel), filed a brief on behalf of City of Oswego as amicus curiae.
 Robert B. Weintraub, New York City (Bruce N. Clark, Oswego, NY, of counsel), filed a brief on behalf of County of Oswego as amicus curiae.
 Before NEWMAN, CARDAMONE, and MAHONEY, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 Alcan Aluminum Corporation (Alcan) and Cornell University appeal from an order of the United States District Court for the Northern District of New York, (McAvoy, J.), granting summary judgment in favor of appellees, United States and New York State, holding Alcan jointly and severally liable for cleanup of a hazardous waste site, and allowing Alcan to obtain contribution from Cornell. United States v. Alcan Aluminum Corp., 755 F.Supp. 531 (N.D.N.Y.1991).
 
 
 2
 Alcan and a host of amicus briefs have presented us with a parade of horribles predicated on their view that under the district court opinion, hazardous substances include breakfast cereal, the soil, and nearly everything else upon which life depends, and that such an approach will make liable for response costs the butcher, the baker and the candlestick maker. They posit that to avoid such an absurd result, liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 et seq. (1988, Supp. I 1989 & Supp. II 1990), should not be imposed unless a responsible party has contributed some minimum concentration of a hazardous element or compound.
 
 
 3
 Admittedly, there is some force to this argument; yet, the government's response is also compelling. It notes that were we to limit liability in the manner Alcan and amici suggest, each potential defendant in a multi-defendant CERCLA case would be able to escape liability simply by relying on the low concentration of hazardous substances in its wastes, and the government would be left to absorb the clean-up costs. Several courts have already held such was not the aim of Congress.
 
 
 4
 In passing CERCLA Congress faced the unenviable choice of enacting a legislative scheme that would be somewhat unfair to generators of hazardous substances or one that would unfairly burden the taxpaying public. The financial burdens of toxic clean-up had been vastly underestimated--in 1980 when CERCLA was enacted $1.8 billion was thought to be enough. In 1986 when the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99-499, 100 Stat. 1613 (1986), was passed, $100 billion was held to be needed. It may well be more today. It is of course the public-at-large that is already bearing the economic brunt of this enormous national problem. There may be unfairness in the legislative plan, but we think Congress imposed responsibility on generators of hazardous substances advisedly. And, even were it not advisedly, we still must take this statute as it is.
 
 
 5
 Having assessed CERCLA's plain meaning, its legislative history, and the case law construing it, we think the tension may be resolved by allowing a responsible party, like Alcan, to pay nothing if it can demonstrate that its pollutants, when mixed with other hazardous wastes, did not contribute to the release or the resulting response costs. In this respect we essentially adopt the Third Circuit's reasoning in United States v. Alcan Aluminum Corp., 964 F.2d 252, 267-71 (3d Cir.1992) (Alcan-Butler ). This approach is not intended to provide an escape hatch for CERCLA defendants; rather, it will permit such a defendant to avoid liability only when its pollutants contribute no more than background contamination.
 
 BACKGROUND
 A. Facts
 
 6
 From 1970 to 1977 Pollution Abatement Services (PAS) operated a waste disposal and treatment center on 15 acres of land in Oswego County, New York. The PAS facility there stored, processed, and disposed of chemical wastes from a number of sources; as a result the site became contaminated with hazardous substances. In 1977 the Environmental Protection Agency (EPA) and New York State undertook response and clean-up measures and spent over $12 million in the ensuing ten years on remedial actions.
 
 
 7
 Alcan used PAS during the 1970s and arranged for disposal or treatment there of 4.6 million gallons of oil emulsion. This emulsion--used in Alcan's manufacturing process--consisted mostly of water and mineral oil, along with small aluminum ingot shavings containing lead, copper, chromium, zinc, and cadmium compounds.
 
 
 8
 In 1974, a stock-pile of coal caught fire at Cornell University's Ithaca, New York campus. The local fire department extinguished it with water, and some of the run-off from the coal pile flowed into area streams. After consultation with New York environmental officials, Cornell collected this coal run-off water and neutralized it. For two years following the fire, Cornell sent 551,000 gallons of the neutralized run-off water to the Oswego PAS site. When in 1983 Cornell was notified of hazardous waste problems at the PAS site, it explained to the EPA what waste it had sent there for disposal. In March 1986 Cornell purportedly resolved any question of its liability with the EPA, which thereupon removed the University from its list of those parties potentially responsible for response costs at PAS.
 
 B. Present Suit
 
 9
 Ten years after the 1977 commencement of clean-up efforts, in 1987 the United States and New York (collectively the government) brought a CERCLA § 107(a), 42 U.S.C. § 9607(a), action to recover response costs against 83 of the parties potentially responsible for the environmental problems at the Oswego site. The government entered into a consent decree with 82 of these defendants, recovering 74 percent or $9.1 million of the clean-up costs it had incurred. Alcan was the lone holdout. The government sued it for the $3.2 million of unrecovered costs. In 1988 Alcan served a third-party complaint against Cornell seeking contribution from it for a share of the clean-up costs.
 
 
 10
 After discovery had been completed, the government moved for summary judgment against Alcan contending that Alcan's disposal of hazardous substances at PAS had been conceded. Alcan cross-moved for summary judgment against the United States and New York State, asserting principally that CERCLA's definition of "hazardous substance" requires a minimum concentration level of specific compounds and that under the statute causation needed to be demonstrated. Alcan also asserted that the harm caused by its waste was divisible and that the government claim improperly subjected it to joint and several liability. Alcan also moved for summary judgment against Cornell University, as a third-party defendant, and Cornell cross-moved in turn for summary judgment against Alcan.
 
 
 11
 The district court granted summary judgment for the government against Alcan, and for Alcan against Cornell on January 15, 1991. It rejected Alcan's arguments concerning minimum concentration requirements and causation. It further held Alcan had failed to meet its burden to show that the harm at PAS was divisible, and awarded the government approximately $4 million in accumulated response costs. With respect to Cornell, the district court stated that the University was responsible to Alcan for its "fair share" of the clean-up costs and refused to shield the university from liability on the basis of its removal by the EPA from the list of potentially responsible parties. See 755 F.Supp. at 543-45.
 
 
 12
 On November 19 and 20, 1991 the trial court held a "fair share" hearing to determine the extent of Cornell's liability to Alcan. Adopting a six-factor fair share allocation test from United States v. R.W. Meyer, Inc., 932 F.2d 568 (6th Cir.1991), it ruled Cornell was responsible for six percent of the response cost recovered by the government from Alcan and therefore awarded Alcan $310,540.92. The final judgment against Alcan was more than $5 million, due to additional clean-up costs and prejudgment interest. Alcan and Cornell appeal from an amended final judgment of the district court entered May 29, 1992, and Cornell also appeals from its January 15, 1991 order.
 
 DISCUSSION
 I Collateral Estoppel
 
 13
 Before considering the merits of the appeal, it is necessary to rule on a collateral estoppel argument raised by the government against Alcan's appeal arising from similar litigation the government brought in Pennsylvania against Alcan.
 
 A. The Alcan-Butler Litigation
 
 14
 In November 1989--two years after the institution of the instant litigation--the United States brought an identical cause of action against Alcan under the same provision, CERCLA § 107(a), to recover costs incurred in the clean-up of Butler Tunnel, a waste disposal facility located on the banks of the Susquehanna River in Pennsylvania. The United States District Court for the Middle District of Pennsylvania on May 8, 1991 granted the United States' motion for summary judgment against Alcan, relying entirely on the reasons set forth in Judge McAvoy's decision handed down on January 15, 1991 in the case we are now reviewing.
 
 
 15
 Alcan appealed to the Third Circuit arguing that (1) CERCLA contains a minimum quantitative requirement for "hazardous substance," (2) Alcan's emulsion falls within CERCLA's petroleum exception, (3) the decision of the District Court for the Middle District of Pennsylvania is inconsistent with EPA regulations under CERCLA, (4) CERCLA requires a specific causal relationship, and (5) CERCLA fails to give fair notice of what is considered a hazardous substance to potential defendants. On May 14, 1992 the Third Circuit rejected each of these arguments. See Alcan-Butler, 964 F.2d at 259-67. But it vacated the Middle District Court's judgment and remanded the case to that court for a hearing on divisibility. Id. at 271. Rehearing in banc was denied in July 1992. See id.
 
 
 16
 The government now insists that Alcan has presented to us the precise issues that were raised, litigated, and decided against it in Alcan-Butler. To make its point, it itemizes the arguments in Alcan's brief before us and demonstrates that they mirror the recited issues addressed in Alcan-Butler.
 
 B. Collateral Estoppel No Bar
 
 17
 We analyze the collateral estoppel doctrine as it pertains to this appeal. Res judicata, or claim preclusion, means simply that when a judgment is rendered on the merits, it bars a second suit between the same parties or their privies based on the same cause of action or claims. See 1B J.W. Moore, Moore's Federal Practice p 0.405 (2d ed. 1992). Under collateral estoppel, or issue preclusion, the second suit is upon a different claim or cause of action. This doctrine's fundamental notion is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies, see Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Collateral estoppel saves parties and the courts from the waste and burden of relitigating stale issues, see 1B Moore, supra p 0.441, and, by discouraging inconsistent results, forwards public policy favoring the establishment of certainty in legal relations. See United States v. Stauffer Chem. Co., 464 U.S. 165, 176-77, 104 S.Ct. 575, 581-82, 78 L.Ed.2d 388 (1984) (White, J., concurring in result); Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980).
 
 
 18
 There are exceptions to the use of collateral estoppel. For example, a court should decline to give preclusive effect to a prior judgment if there have been changes either in the applicable legal rules or the factual predicates essential to that prior judgment. See Haitian Centers Council, Inc. v. McNary, 969 F.2d 1350, 1356 (2d Cir.), cert. granted, --- U.S. ----, 113 S.Ct. 52, 121 L.Ed.2d 22 (1992). In addition, where pure questions of law--unmixed with any particular set of facts--are presented to a court, the "interests of finality and judicial economy may be outweighed by other substantive policies." Id.; accord 18 Charles A. Wright et al., Federal Practice & Procedure § 4425 (1981 & Supp.1992). The government insists the various recognized exceptions to the use of collateral estoppel are inapplicable, while Alcan attempts to bring itself within one or more of these exclusions to the estoppel doctrine.
 
 
 19
 The issue posed is whether the Pennsylvania courts should have given estoppel effect to the rulings of the Northern District or whether the Northern District should have given estoppel effect to the rulings of the Pennsylvania courts. The matter is complicated by the procedural facts. The Northern District's ruling of January 15, 1991 preceded any of the Pennsylvania rulings. But by the time the Northern District entered a final judgment, the Pennsylvania district court had made its rulings and the Third Circuit had affirmed those rulings in part and remanded on the issue of divisibility.
 
 
 20
 We have taken a broad view of the application of collateral estoppel to rulings made at an interim stage of litigation. Estoppel is applied when "the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." Lummus Co. v. Commonwealth Oil Ref. Co., 297 F.2d 80, 89 (2d Cir.1961), cert. denied, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962); accord Sherman v. Jacobson, 247 F.Supp. 261, 268 (S.D.N.Y.1965); see also Stauffer Chem., 464 U.S. at 180, 104 S.Ct. at 583 (White, J., concurring in result) (estoppel is a "flexible, judge-made doctrine").
 
 
 21
 In this case, we are satisfied that the liability ruling made by the Northern District was sufficiently final to be entitled to estoppel effect. Of course, it is not up to us to determine whether the district court of another circuit was obliged to give such effect to the Northern District ruling. We have no authority to review the rulings of the Pennsylvania district court. We are nonetheless entitled to decide that we think the Northern District's ruling deserves preclusive effect and, that being so, it follows, at least for purposes of litigation in this Circuit, that the Northern District was entitled to enter a final judgment based on its earlier liability ruling and was not obliged to give estoppel effect to any rulings entered in the Pennsylvania courts after the date of its January 15, 1991 ruling. Cf. Laaman v. United States, 973 F.2d 107, 112-13 (2d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).
 
 II Liability Under CERCLA
 A. Chronology
 
 22
 Before entering upon an analysis of the merits of this appeal it will be helpful to set forth an overview of CERCLA. In bringing an action under this Act, the government must establish that: (1) defendant is one of the four categories of covered persons listed under § 9607(a) as liable for the costs of remedial action, (2) the site of the clean-up is a facility under § 9601(9), (3) there is a release or threatened release of hazardous substances at the facility, (4) as a result of which plaintiff has incurred response costs, and (5) the costs incurred conform to the national contingency plan under § 9607(a)(4)(A) as administered by the EPA. See B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir.1992). If the government establishes each of these elements on undisputed facts, and the defendant is unable to demonstrate by a preponderance of the evidence the existence of one of the three affirmative defenses set forth in § 9607(b), then plaintiff is entitled to summary judgment on the issue of liability, even when genuine issues of material fact remain as to appropriate damages. See Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 668 (5th Cir.1989).
 
 
 23
 Liability may be decided first before the more complicated questions implicated in clean-up measures, which includes fixing the proportionate fault of liable parties. Id. at 667. Bifurcation and summary judgment provide powerful legal tools which, by effectively isolating the issues to be resolved, avoid lengthy and perhaps needless litigation. The existence of those procedural tools aids Congress' purpose by encouraging settlement discussions and speeding up remedial action. See id. at 668.
 
 B. Liability Issues
 
 24
 Alcan attempts to interpose a number of additional defenses to prevent the imposition of liability. It argues that a polluter should not be held liable unless: a) the concentration of hazardous substances in its wastes exceeds some minimum threshold; b) its wastes fall within certain EPA reporting requirements; and c) its wastes caused the government to incur response costs. Under the present reading of CERCLA none of these issues may be considered in imposing liability.
 
 
 25
 1. Quantitative Thresholds for Hazardous Substances
 
 
 26
 CERCLA § 9601(14) defines "hazardous substance" by cross-referencing several other environmental statutes. The term includes: "(A) any substance" designated under the Clean Water Act, "(B) any element, compound, mixture, solution, or substance" under CERCLA § 9602, "(C) any hazardous waste" listed in § 3001 of the Solid Waste Disposal Act, "(D) any toxic pollutant" listed in § 307(A) of the Clean Water Act, "(E) any hazardous air pollutant listed under" § 112 of the Clean Air Act, and "(F) any imminently hazardous chemical substance or mixture" with respect to which the EPA has taken action. 42 U.S.C. § 9601(14) (emphasis added). The statute on its face applies to "any" hazardous substance, and it does not impose quantitative requirements.
 
 
 27
 The breadth of § 9601(14) cannot be easily escaped, and we have expressly held that "[q]uantity or concentration is not a factor." Murtha, 958 F.2d at 1200; accord Alcan-Butler, 964 F.2d at 259-61. We have also reasoned that "when Congress wanted to draw distinctions based on concentration or quantity, it expressly provided as much." Murtha, 958 F.2d at 1200; accord Alcan-Butler, 964 F.2d at 261 (same). The absence of such quantity requirements in CERCLA leads inevitably to the conclusion that Congress planned for the "hazardous substance" definition to include even minimal amounts of pollution. See Eagle-Picher Indus., Inc. v. United States E.P.A., 759 F.2d 922, 927-28 (D.C.Cir.1985).
 
 
 28
 2. EPA Definition of Hazardous Substances under CERCLA
 
 
 29
 Pursuant to § 9602(a), the EPA has designated certain substances as hazardous in 40 C.F.R. § 302.4 (1992) and the accompanying table. This regulation sets out broad headings of elements, within which are established specific reportable quantities ("RQs") of substances and chemical abstracts service registry numbers ("CASRNs"). Alcan admits that the elements in its oil emulsion fall within the broad categories listed by the EPA, but it notes that these elements are not given RQs and CASRNs. Thus, it argues that these elements should not be classified as hazardous under CERCLA, as all hazardous elements must have RQs and CASRNs. According to Alcan, a contrary interpretation renders the EPA regulation meaningless.
 
 
 30
 We need not dwell long on this argument. Besides the district court in this case, see Alcan, 755 F.Supp. at 538, two other courts have assessed and rejected this proposition. See Alcan-Butler, 964 F.2d at 262-63; City of New York v. Exxon Corp., 766 F.Supp. 177, 181-83 (S.D.N.Y.1991) (also involving Alcan). Each of these courts has essentially determined that the RQs and CASRNs are irrelevant for CERCLA liability purposes. The EPA draws a vital distinction that makes this plain: RQs and CASRNs only go to reporting requirements, they do not address the issue of CERCLA liability. See Exxon, 766 F.Supp. at 182-83 (citing and quoting EPA interpretation in 50 Fed.Reg. 13,456, 13,461, 13,472-73 (April 5, 1985)). We believe this reasoning correct and therefore adopt it.
 
 3. Causation under CERCLA
 
 31
 CERCLA § 9607(a) imposes strict liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment" of hazardous substances "from which there is a release, or a threatened release which causes the incurrence of response costs." § 9607(a)(3) and (4). The plain meaning of this language dictates that the government need only prove: (1) there was a release or threatened release, which (2) caused incurrence of response costs, and (3) that the defendant generated hazardous waste at the clean-up site. What is not required is that the government show that a specific defendant's waste caused incurrence of clean-up costs.
 
 
 32
 As earlier noted, there are "only" three defenses to imposition of liability on a generator: an act of God, an act of war, and an act or omission of a third party. 42 U.S.C. § 9607(b). In State of New York v. Shore Realty Corp., 759 F.2d 1032, 1044 (2d Cir.1985), we held that the owner of a facility was liable under CERCLA without a finding of causation of the release because "including a causation requirement makes superfluous the affirmative defenses provided in section 9607(b)." Id. Our reading drew additional support from CERCLA's legislative history, from which we concluded that "Congress specifically rejected including a causation requirement" in this section. Id. Other circuits have reached the same conclusion. See Alcan-Butler, 964 F.2d at 265; Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d 1146, 1152-54 (1st Cir.1989); United States v. Monsanto Co., 858 F.2d 160, 170 (4th Cir.1988), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Hence, it seems plain that in addition to imposing a strict liability scheme, CERCLA does away with a causation requirement.
 
 
 33
 Alcan argues to the contrary, primarily relying upon the Fifth Circuit's decision in Amoco Oil Co., 889 F.2d at 670, which it interprets as establishing a causal nexus requirement. Alcan further presses that in order for a causal connection to exist, there must be levels of hazardous substance above ambient or background. The Third Circuit assessed and rejected this assertion, noting that the Fifth Circuit did not hold that the factual inquiry concerning whether a release has caused response costs would implicate whether an alleged polluter's waste caused response costs. Alcan-Butler, 964 F.2d at 266. We agree with the Third Circuit that Amoco Oil is distinguishable.
 
 III Divisibility
 A. General Principles
 
 34
 Having rejected Alcan's proffered defenses to liability, one would suppose there is no limit to the scope of CERCLA liability. To avoid such a harsh result courts have added a common law gloss onto the statutory framework. They have at once adopted a scheme of joint and several liability but at the same time have limited somewhat the availability of such liability against multiple defendants charged with adding hazardous substances to a Superfund site. See, e.g., O'Neil v. Picillo, 883 F.2d 176, 178-79 (1st Cir.1989), cert. denied, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); United States v. Chem-Dyne Corp., 572 F.Supp. 802, 808 (S.D.Ohio 1983). The Restatement (Second) of Torts § 433A (1965) has been relied upon in determining whether a party should be held jointly and severally liable, for the entire cost of remediating environmental harm at the site. See, e.g., Alcan-Butler, 964 F.2d at 268-69; O'Neil, 883 F.2d at 178; Monsanto, 858 F.2d at 171-73; see also United States v. R.W. Meyer, 889 F.2d 1497, 1506-08 (6th Cir.1989). Under § 433A of the Restatement where two or more joint tortfeasors act independently and cause a distinct or single harm, for which there is a reasonable basis for division according to the contribution of each, then each is liable for damages only for its own portion of the harm. In other words, the damages are apportioned. But where each tortfeasor causes a single indivisible harm, then damages are not apportioned and each is liable in damages for the entire harm.
 
 
 35
 Based on these common law principles, Alcan may escape any liability for response costs if it either succeeds in proving that its oil emulsion, when mixed with other hazardous wastes, did not contribute to the release and the clean-up costs that followed, or contributed at most to only a divisible portion of the harm. See Alcan-Butler, 964 F.2d at 270. Alcan as the polluter bears the ultimate burden of establishing a reasonable basis for apportioning liability. See Monsanto, 858 F.2d at 172; Chem-Dyne, 572 F.Supp. at 810. The government has no burden of proof with respect to what caused the release of hazardous waste and triggered response costs. It is the defendant that bears that burden. To defeat the government's motion for summary judgment on the issue of divisibility, Alcan need only show that there are genuine issues of material fact regarding a reasonable basis for apportionment of liability. As other courts have noted, apportionment itself is an intensely factual determination. See, e.g., Chem-Dyne, 572 F.Supp. at 811.
 
 
 36
 In so ruling we candidly admit that causation is being brought back into the case--through the backdoor, after being denied entry at the frontdoor--at the apportionment stage. We hasten to add nonetheless that causation--with the burden on defendant--is reintroduced only to permit a defendant to escape payment where its pollutants did not contribute more than background contamination and also cannot concentrate. To state this standard in other words, we adopt a special exception to the usual absence of a causation requirement, but the exception is applicable only to claims, like Alcan's, where background levels are not exceeded. And, we recognize this limited exception only in the absence of any EPA thresholds.
 
 
 37
 Contrary to the government's position, commingling is not synonymous with indivisible harm, and Alcan should have the opportunity to show that the harm caused at PAS was capable of reasonable apportionment. It may present evidence relevant to establishing divisibility of harm, such as, proof disclosing the relative toxicity, migratory potential, degree of migration, and synergistic capacities of the hazardous substances at the site. See Alcan-Butler, 964 F.2d at 270 n. 29, 271; Monsanto, 858 F.2d at 172 n. 26.
 
 
 38
 Alcan declares that the response actions at PAS were attributable to substances such as PCB's, nitro benzene, phenol, dichlonoethone, toluene, and benzene. It contends that no soil contamination due to heavy metals was found there, and insists that the metallic constituents of its oil emulsion are insoluble compounds, submitting an affidavit supporting this theory of divisibility. The government submitted a declaration stating that metal contaminants like those found in Alcan's waste emulsion were present in environmental media at PAS, that the commingling of metallic and organic hazardous substances resulted in indivisible harm, and that though some forms of lead, cadmium and chromium are insoluble, they may chemically react with other substances and become water-soluble. These differing contentions supported by expert affidavits raise sufficient questions of fact to preclude the granting of summary judgment on the divisibility issue.
 
 B. Timing of the Divisibility Issue
 
 39
 The Third Circuit concluded that a divisibility inquiry is one "best resolved at the initial liability phase" because it involves "relative degrees of liability." See Alcan-Butler, 964 F.2d at 270, n. 29 (emphasis in original). Although we prefer this common sense approach, it may be contrary to the statutory dictates of CERCLA. In Shore Realty Corp., 759 F.2d at 1032, we reviewed CERCLA's language and legislative history and concluded that the federal government through the EPA responds to releases or threatened releases of hazardous substances immediately and later attempts to collect the remediation costs from others. See id. at 1041. We also determined, as previously stated, that importing a causation requirement into the strict liability of § 9607(a) would render the affirmative defenses in § 9607(b) superfluous. Id. at 1044-45. Legislative support for that view is found in House Report No. 96-1016's statement of the purpose of the original bill. It envisioned that the EPA would "pursue rapid recovery of the costs" incurred in clean-up. H.R.Rep. No. 96-1016, 96th Cong., 2d Sess. 17, reprinted in 1980 U.S.C.C.A.N. 6119, 6120.
 
 
 40
 A similar review of the legislative history of CERCLA and the SARA amendments of 1986 was undertaken in Murtha, which construes the Act and its amendments to enable the EPA to respond "efficiently and expeditiously" to environmental threats and to hold the parties responsible liable for the cleanup costs in an action by the EPA to recoup them. See Murtha, 958 F.2d at 1198. In those cases where this burden of recoupment costs is unfair or disproportionate, such may be alleviated under § 9613(f)(1) after the response costs are fixed. Id. at 1206. Again, we are told in the Judicial Review portion of House Report No. 99-253(I) that "[t]o avoid delay of cleanups and to minimize litigation, responsible parties would be allowed to challenge the cleanup remedy after acknowledging liability for the hazardous waste site." H.R.Rep. No. 99-253(I), 99th Cong., 2d Sess. 59, reprinted in 1986 U.S.C.C.A.N. 2835, 2841 (emphasis added). The administrator of the EPA, who was primarily responsible for drafting the SARA amendments, at the time of their enactment declared they would "[e]xpedite civil actions by requiring that separate suits be brought against other potentially liable parties for contribution after judgment or settlement in enforcement actions." Id. at 124, 1986 U.S.C.C.A.N. at 2906 (emphasis added).
 
 
 41
 Consequently, the language of CERCLA and SARA and their legislative histories appear to demonstrate the following chronology: liability is fixed first and immediately for enforcement purposes; litigation later to sort out what contribution is owed and by whom as a result of the remediation effort. But we do not rule that this chronology be followed or that the Alcan-Butler approach of deciding divisibility at the initial liability phase of the case is the best way for the district court to proceed. Instead, the choice as to when to address divisibility and apportionment are questions best left to the sound discretion of the trial court in the handling of an individual case.
 
 IV Cornell
 A. Potentially Liable Party under CERCLA
 
 42
 Cornell believes it should be shielded from liability for contribution by virtue of having resolved its liability to the United States and the State of New York. We discuss first whether Cornell is a potentially liable party under CERCLA § 9607.
 
 
 43
 CERCLA § 9613(f)(1) provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section [9607(a) ]." § 9613(f)(1). Of the four classes of individuals subject to liability under § 9607(a), Cornell submits that only the third--any person who by contract, agreement or otherwise arranged for disposal or treatment of hazardous substances--is relevant because it contracted to have its coal run-off sent to PAS. But, it continues, because the EPA removed the University from the list of those potentially responsible parties, a fortiori, it may not be a potentially liable party under § 9607(a). Alcan responds that Cornell's coal waste water was essentially the same as Alcan's oil emulsion, and that there is no principled basis under the statute for treating Cornell differently.
 
 
 44
 The statutory language imposes liability and contribution upon "any person" who arranges for disposal of waste at a facility. Under the plain meaning of this language it is difficult to see how Cornell could avoid being included. Cornell points to no cases that in fact have drawn the distinction it urges us to adopt. Hence, Cornell is a potentially liable party under § 9607(a)(3).
 
 B. Retroactive Application of SARA
 
 45
 Cornell was removed by the EPA in March 1986 from the list of potentially responsible parties before the SARA amendments' proceedings for contribution under § 9613 became effective on October 17, 1986. Compelled contribution, in its view, could therefore only occur as a result of retroactive application of SARA.
 
 
 46
 If that statement reflected the whole matter, we would agree. There is a strong presumption against the retrospective application of a statute. It is familiar law, the Supreme Court instructs, that while judicial decisions operate retrospectively, statutes look only to the future. See United States v. Security Indus. Bank, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982). No law, including SARA, should be construed retrospectively unless Congress' purpose can be satisfied in no other way or unless the statutory language admits of no other meaning. See United States Fidelity & Guar. Co. v. Struthers Wells Co., 209 U.S. 306, 314, 28 S.Ct. 537, 539, 52 L.Ed. 804 (1908). Yet, in apparent conflict with this rule there is another principle: that a court should apply law existing at the time of its decision unless to do so is contrary to the plain meaning of a statute or would cause manifest injustice. See Bradley v. Richmond Sch. Bd., 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974).
 
 
 47
 Fortunately, we need not choose between these conflicting precedents, see Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 836-37, 110 S.Ct. 1570, 1576-77, 108 L.Ed.2d 842 (1990), because in the case at hand the outcome is the same under either rule. Cf. Litton Sys., Inc. v. American Tel. & Tel. Co., 746 F.2d 168, 170-71 (2d Cir.1984) (Bradley rule applies only to cases pending on direct appeal at time change in law occurs).
 
 
 48
 Prior to the 1986 SARA amendments to CERCLA, federal common law principles applied, and these rules did not shield Cornell from having contribution sought from it. See United States v. Conservation Chem. Co., 628 F.Supp. 391, 402 (W.D.Mo.1985) (invoking 1977 Uniform Comparative Fault Act as to pre-SARA settlement). SARA's 1986 provision in § 9613(f) for a statutory cause of action for contribution codifies what had been generally held implicit under the 1980 Act. See H.R.Rep. No. 99-253(I), 99th Cong., 2d Sess. 79, reprinted in 1986 U.S.C.C.A.N. 2835, 2861 (SARA "confirms" federal right of contribution under CERCLA). In that Act courts are granted implicit authority, using appropriate equitable factors, to "allocate response costs among liable parties." O'Neil, 883 F.2d at 179. Hence, we are not applying SARA retroactively in order to hold Cornell liable for contribution as the University asserts; rather, we are relying on common law principles that predated SARA.
 
 C. Required to Contribute
 
 49
 The last point Cornell raises is that since it resolved its liability in an administratively approved settlement, it should be insulated from any requirement to contribute. CERCLA § 9613(f)(2) provides that a "person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution." § 9613(f)(2).
 
 
 50
 The district court thought § 9613 was inapplicable and that the EPA and Cornell did not settle any question of liability. Rather, it believed the government--employing prosecutorial discretion--simply chose not to sue Cornell. The University naturally views the situation quite differently. It asserts this is not a case of prosecutorial discretion. We are told instead that the government entered into negotiations with the University, requested and received technical studies from it, and ultimately decided not to hold it liable. This interaction, according to Cornell, constitutes an "administrative settlement."
 
 
 51
 Although this argument appears at first blush to be compelling, upon closer examination it does not carry the day. First, if the SARA amendments were to be applied retrospectively, the negotiations between Cornell and the EPA did not amount to an "administrative settlement" because those procedural steps necessary to effectuate a settlement under CERCLA § 9622 were not followed. Section 9622, which deals in part with de minimis settlements, states that a settlement "shall be entered as a consent decree or embodied in an administrative order setting forth the terms of the settlement," and where the total response costs exceed $500,000, as they do here, such an order may only be issued "with the prior written approval of the Attorney General." 42 U.S.C. § 9622(g)(4). Further settlement procedures set forth in § 9622(i)(1) include notice of such being published in the Federal Register, which concededly did not take place in the instant case. Only when these procedures are followed is a party shielded from a contribution claim.
 
 
 52
 Second, applying the SARA amendments prospectively, Cornell has not met the requirements for protection from contribution under federal common law. Under § 6 of the Uniform Comparative Fault Act, "[a] release, covenant not to sue, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution." See Conservation Chem. Co., 628 F.Supp. at 402 (principles of 1977 Uniform Comparative Fault Act are "the most consistent with, and do the most to implement" congressional intent underlying CERCLA). The EPA merely advised Cornell that it was removing Cornell from the list of potentially responsible parties. The EPA and Cornell did not enter into a release, covenant not to sue, or any other similar, legally binding agreement.
 
 
 53
 We are satisfied therefore that the district court properly found Cornell liable or potentially liable under § 9607(a) of the Act and that federal common law rules under § 9613(f)(1) made Cornell liable to a suit for contribution. Having said this, we note that if at the directed hearing Alcan succeeds on any issue and has its contribution reduced, Cornell's share should also be reduced since it has been determined that its contribution is fixed at six percent of Alcan's. As an equitable consideration, the University should also be given an opportunity to have its waste water claim evaluated in the same light as Alcan's similar claim. If indeed, as Cornell claims, it can show that the University's wastes did not, when mixed with other wastes, contribute to the release or resultant response costs, then Cornell should succeed on this § 9604(a)(3) issue, and it would of course avoid any liability or contribution.
 
 CONCLUSION
 
 54
 After careful consideration of all the other arguments raised by the parties, we find they do not need to be addressed as our opinion fully disposes of them. Accordingly, for the reasons stated the district court's amended final judgment of May 29, 1992 is affirmed, in part, and reversed, in part, and remanded for further proceedings, and the order of January 15, 1991 is also remanded for further proceedings, both consistent with this opinion.