**STATE OF WASHINGTON; and Paccar, Inc., Plaintiffs,**

v.

**UNITED STATES of America; United States Navy; United States Army; and United States Coastguard, Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**STATE OF WASHINGTON and Paccar, Inc., Defendants.**

**Nos. C94–5326FDB, C94–5518FDB.**

United States District Court, W.D. Washington, at Tacoma.

March 7, 1996.

Charles F. Secrest, Deborah Lee Cade, Attorney General's Office, Olympia, WA, for State of Washington.

William D. Maer, Kathryn Guillou, Ralph Palumbo, Heller, Ehrman, White & McAuliffe, Seattle, WA, for Paccar Inc.

James L. Nicoll, Jr., U.S. Department of Justice, Environmental Enforcement Section, Seattle, WA, Sean Kevin Carman, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, Ricardo A. Guarnero, U.S. Attorney's Office, Seattle, WA, Richard David Mednick, Regional Counsel, U.S. Environmental Protection Agency, Seattle, WA, Lewis M. Barr, U.S. Department of Justice, Environmental Defense Section, Washington, DC, for U.S.

Ricardo A. Guarnero, U.S. Attorney's Office, Seattle, WA, Lewis M. Barr, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, for United States Navy, United States Department of Army, United States Coast Guard.

## ORDER ON REPORT & RECOMMENDATION RE SUMMARY JUDGMENT ON DIVISIBILITY OF HARM

BURGESS, District Judge.

### BACKGROUND

This matter comes before the court upon the United States' objections to the Report and Recommendation on the State's and PACCAR's Motions for Summary Judgment on Divisibility of Harm. The State of Washington moved for an order dividing for all purposes, including allocation of liability and damages, the portion of the Wyckoff/Eagle Harbor Superfund Site here involved, into the East Harbor Operable Unit (EHOU) and the West Harbor Operable Unit (WHOU) on the grounds that there is a distinct environmental harm and/or a reasonable basis to apportion environmental harm between the two Operable Units. PACCAR, INC. has moved for a ruling that the environmental harm at the Wyckoff/Eagle Harbor Superfund Site is divisible. The United States opposed the division requested in both motions.

The Report and Recommendation concluded (1) that the law provides for division upon the showing of a reasonable basis for determining the contribution of each cause to a single harm, *i.e.*, the contamination of Eagle Harbor, (2) that there were sufficient undisputed facts to support a "reasonable basis," and (3) that the motions for division should be granted.

### STANDARD OF REVIEW

When a Magistrate Judge enters a Report and Recommendation on a dispositive matter, the United States District Court "shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule." Fed.R.Civ.P. 72(b).

### APPLICABLE LAW

The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) was designed to facilitate prompt

clean-up of hazardous waste sites. Superfund monies may be expended to effect prompt clean-up, then the amounts of compensation owed by each potentially responsible party in the particular case is determined in order to replenish the fund. *See, e.g., United States v. Western Processing*, 734 F.Supp. 930, 941 (W.D.Wash.1990). CERCLA is silent on the issue of joint and several liability, but the legislative history indicates common law principles of joint and several liability may affect liability. *See, e.g., In re Bell Petroleum*, 3 F.3d 889 (5th Cir.1993). The principles that apply in determining whether there should be joint and several liability are contained in the *Restatement (Second) of Torts*, § 433A, which provides:

(1) Damages for harm are to be apportioned among two or more causes where

  (a) there are distinct harms, or

  (b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.

■ "Environmental harm" is defined by the Courts in divisibility analysis as "the hazardous substances present at the facility and the response costs incurred in dealing with them." *United States v. Rohm and Haas Co.*, 2 F.3d 1265, 1280 (3d Cir.1993); *accord, United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir.1993).

■ The nature of the harm is the key factor in determining whether apportionment is appropriate, and the Restatement describes some examples where division is appropriate:

(1) Distinct harms: two defendants shoot the plaintiff at the same time, one wounding him in the arm, one wounding him in the leg. Although the elements of damages of lost wages and pain and suffering may be difficult to apportion, it is still possible as a logical, reasonable, and practical matter to make a rough estimate for a fair apportionment. *Id. comment* b on subsection (1).

(2) Successive harms: two defendants, independently operating the same plant, pollute a stream over successive periods of time. Apportionment/division is appropriate because each has caused a separate amount of harm, limited in time, and neither is responsible for the harm caused by the other. *Id. comment* c on subsection (1).

(3) Single harm: this type of harm may not be so clearly marked out as severable into distinct parts, but is still capable of division upon a reasonable and rational basis among the causes responsible. Where such division may be made without injustice to any of the parties, the court may require it to be made. *Id. comment* d on subsection (1). Two examples from *comment* d: (i) Cattle owned by two or more persons trespass upon the plaintiff's land and destroy his crops. The single harm is the lost crop. The harm may be apportioned among the cattle owners on the basis of the number of cattle owned by each and the reasonable assumption that the respective harm done is proportionate to that number. (ii) Two or more factories pollute a stream. Apportionment may be made on the basis of evidence of the respective quantities of pollution discharged into the stream.

■ Apportionment is inappropriate in cases where the harm is not capable of reasonable, logical, or practical division, such as death, a single wound, destruction of a house by fire, or the sinking of a barge. *Id. comment* on Subsection (2). Courts in such cases do not make arbitrary apportionment for its own sake, and each of the causes of charged with responsibility for the entire harm, *i.e.*, joint and several liability. *Id.* Another instance where apportionment is inappropriate in the exceptional circumstances where injustice may result to the plaintiff, as when one of two tortfeasors is so hopelessly insolvent that the plaintiff would never be able to collect from him. *Id.*

■ Thus, the decision on whether to impose joint and several liability in a CERCLA case turns on whether there is a reasonable and just method for determining the amount of harm that was caused by each defendant. This question of whether the harm is capable of apportionment is a question of law. *Restatement (Second) of Torts*, § 434(1)(b). If apportionment has been determined to be appropriate, the actual appor-

tionment of damages is a question of fact. *Id.* § 434(2)(b).

The burden of demonstrating that the harm is capable of apportionment is upon the party seeking to limit its liability by this means, *In re Bell Petroleum,* 3 F.3d at 896. In this regard, it must be noted that the Government in CERCLA cases need not prove a specific causal link between costs incurred and an individual generator's waste. *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 670 n. 8 (5th Cir.1989). "The Government must simply prove that the defendant's hazardous substances were deposited at the site from which there was a release and that the release caused the incurrence of response costs." *United States v. Alcan Aluminum Corp. (Alcan–Butler),* 964 F.2d 252, 266 (3d Cir.1992). "Congress has, therefore, allocated the burden of disproving causation to the defendant who profited from the generation and inexpensive disposal of hazardous waste." *United States v. Monsanto Co.,* 858 F.2d 160, 170 (4th Cir.1988). Thus, when a party seeks to avoid joint and several liability, it has the burden of demonstrating a reasonable basis for concluding that there is a specific environmental harm caused by that party.

The *Restatement* has been utilized in a variety of factual patterns in CERCLA cases since the first published case, *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802 (S.D.Ohio 1983), a case that was cited approvingly in the legislative history of the SARA amendments to CERCLA.

In the following two cases, joint and several liability was found to be appropriate. In *Chem–Dyne,* a variety of hazardous waste from 289 generators or transporters was brought to the Chem–Dyne treatment facility. Some of the wastes had become commingled, the identity of the sources of the wastes was unknown, and there was a dispute over which of the wastes contaminated the ground water, the degree of migration, and their concomitant health hazard; volume of a party's particular waste was not an accurate predictor of its toxicity or migratory potential. The Court concluded that the defendants had not met their burden of demonstrating the divisibility of harm and the degree to which each was responsible.

Similarly, in *O'Neil v. Picillo,* 883 F.2d 176 (1st Cir.1989), a Rhode Island pig farm had been used as a waste disposal site where "massive trenches and pits 'filled with free-flowing, multi-colored, pungent liquid wastes' and thousands of 'dented and corroded drums containing a veritable potpourri of toxic fluids.'" *Id.* at 177. The Court held that because most of the waste could not be identified, and the defendants had the burden of accounting for the uncertainty, the imposition of joint and several liability was appropriate.

In *United States v. Broderick Investment Company,* 862 F.Supp. 272 (D.Colo.1994), the environmental harm at the hazardous waste site was found to be divisible geographically. Using EPA data, BN demonstrated there were two separate areas of groundwater contamination in the form of two distinct pentachlorophenol plumes in distinct geographic areas. The Court held that since BN nor its predecessor ever had an ownership interest in the land on which the processing plant stood, and that the plume had neither merged with the pond plume nor migrated onto the Parcel, BN was not responsible or liable for the plume emanating from the processing plant area. The Court reserved for a later phase the allocation of specific percentages to the recoverable response costs.

Also in *Broderick,* the Court recognized that the determination of divisibility of harm—"apportionment"—may be made earlier in the case at the liability phase, or later at the damages allocation phase or in a contribution action. Damages are generally determined based on equitable considerations. The analysis involved in apportioning liability among several actors is similar to that in allocating damages among jointly and severally liable defendants in a contribution action as both focus on the harm caused by the defendant. *United States v. Alcan–Aluminum Corp.,* 964 F.2d 252, 270 n. 29 (3d Cir.1992). Several courts agree that the divisibility inquiry is best resolved at the initial liability phase. *Broderick,* 862 F.Supp. at 276; *In re Bell Petroleum,* 3 F.3d at 901.

Division based on volume was found to be appropriate in *In re Bell Petroleum.* The harm there was chromium contamination of an aquifer by successive owners of a chrome-plating facility. The Court concluded that there was a reasonable basis to apportion the harm caused by each defendant based on volume. The dissent argued, however, that there was insufficient evidence—not a preponderance—on which to draw the conclusion.

In *Hatco Corp. v. W.R. Grace & Co.—Conn.,* 836 F.Supp. 1049 (D.N.J.1993), apportionment of harm from chemical contamination to an 80-acre parcel was a complex exercise. Apportionment was made based on type of chemical, source, area, and time of use.

Thus, there are various methods of apportionment of harm, depending upon the facts at the particular site that are capable of proof.

## ARGUMENTS

### I.  *United States Objection*

The United States objects to the Magistrate Judge's ruling because its reasoning is inconsistent with prior authority in the Western District of Washington and the overwhelming weight of authority in other circuits, and was decided despite the existence of disputed material facts.

### A.  *Distinguishing Standard for Divisibility from Standard for Equitable Allocation.*

The Government argues that the standard for proving divisibility is different from proving allocation of damages where equitable factors may apply. The Government argues that to remove any inequities that may result from joint and several liability, defendants may allocate cleanup costs among themselves in a contribution action using such equitable factors as the Court determines are appropriate. 42 U.S.C. § 9613(f)(1). The Government argues that where substances have become commingled, liability cannot be reasonably apportioned without some evidence of the interactive qualities of the substances deposited there.

Where the Report erred, according to the Government, was where the principles for apportioning harm were mixed up with the equitable factors that may be considered in allocating damages in a contribution action.

### B.  *Defendants have failed to meet their burden of demonstrating that distinct environmental harms at the site are divisible or that the single environmental harm at the site is reasonably capable of apportionment.*

The Government argues that while there may be areas where the concentrations of certain wastes are greater, these specific wastes are commingled around the entire site, and the State and PACCAR cannot identify the volumes of waste they contributed to the Site and have not even attempted to submit evidence regarding the interactive qualities of their wastes. The Government argues that one cannot assume that commingled hazardous substances will impact the environment in direct proportion to the volume or pattern in which they are distributed *United States v. Monsanto,* 858 F.2d 160, 172 (4th Cir.1988). Similarly, in *United States v. Alcan,* 964 F.2d 252, 269 (3d Cir.1992) ("*Alcan–Butler Tunnel*") the court noted the intensely factual nature of the divisibility issue and that it was dealing with "Alcan's effort to avoid liability otherwise established." In the *Alcan–Butler Tunnel* case, there was a network of underground mines, tunnels, caverns, and pools drained by the Butler Tunnel into the Susquehanna River. In the 1970s, millions of gallons of liquid wastes containing hazardous substances were disposed of through a borehole that led directly into the mine workings. *Id.* at 255–56. The Court observed that "Alcan's burden in attempting to prove the divisibility of harm to the Susquehanna River is substantial, and the analysis will be factually complex as it will require an assessment of the relative toxicity, migratory potential and synergistic capacity of the hazardous waste at issue. *Id.*

Because the State and PACCAR have failed to address how the migration and interactivity of the multiple hazardous substances at the Site have affected the environment, it is impossible to determine how much

of the harm each defendant caused. The Government argues that the State and PAC-CAR cannot identify the volumes of waste they contributed to the Site, and haven't even attempted to introduce evidence relating to the interactive qualities of their wastes.

Moreover, the variations in EPA's remedy selections in the WHOU and the EHOU are based not on the presence or specific effects of particular contaminants, but on their location and concentration.

The Government also argues that the Magistrate's Report will have the effect of excusing PACCAR from any liability in the EHOU and may excuse the State from any liability in the WHOU.

There is no dispute (1) that the principal contaminate in the EHOU are the PAHs from the former woodtreating plant, the principal source, and that (2) the principal contaminate in the WHOU is mercury from the former PACCAR shipyard site, the principal source. The Government maintains that the EPA's feasibility study show that despite the concentrations above, PAHs are found in sufficient concentrations to cause environmental harm in the WHOU, and mercury and other toxic metals are found in the EHOU. Thus, the Magistrate's Report recommends that despite mercury and other toxic metals being found in the EHOU, PAC-CAR would not have to pay for any of the cleanup for those metals in the EHOU. The factors considered in the Magistrate's report may ultimately be a basis for allocating a larger share of EHOU cleanup expenses to someone other than PACCAR, but do not justify completely excusing PACCAR from any responsibility for the contamination it caused in the EHOU. The toxic metals in the EHOU for which PACCAR bears some responsibility have undeniably contributed to the harm in the EHOU, concludes the Government.

## II. Response of The State and PACCAR

The Defendants point to the EPA's rationale for dividing the harbor for facilitation of remedial management:

> ... the distribution of contaminants, the distribution of biological effects, and the

different sources and the status of source control, as well as the likelihood for any dramatic changes in the future were the basis for finding the dividing line....

(EPA Deposition at 59–62.) The Defendants also point out that they have neither admitted nor denied that there are commingled substances that present a single environmental harm. The Defendants contend that it is the EPA that has failed to show that there is a genuine issue for trial after the Defendants have met their burden of coming forward with a reasonable basis for divisibility of harm. It is appropriate, argue Defendants, to consider the distribution pattern of contaminants and the EPA's consequent decision to adopt different remedies for the two areas. There has been no evidence from the EPA concerning toxicity, migratory potential and the potential for synergistic impacts, and it was appropriate for the Magistrate Judge to reject the Government's argument on this point.

The Defendants point to the placement of the dividing line "where there was a decrease in acute toxicity." (EPA 30(b)(6) deposition at 57–59). Defendants also note that there is no evidence that PAH and mercury combine for a synergistic impact that is greater than the sum of the two, or for that matter that the two chemicals are combined at all.

The Defendants then argue that the Magistrate's decision is fair, because once resolving the issue that there is a reasonable basis for dividing the environmental harm at the site, allocation issues will be taken up later. Moreover, Defendants argue that Wykoff, a contributor of PAH contamination in Eagle Harbor, has not been named a potentially responsible party (PRP) in the WHOU (the PAH concentration is in the EHOU), and there is no claim that the State caused any pollution in the EHOU. The United States Army and Navy are the only PRPs who have not so far contributed to the Eagle Harbor cleanup.

## III. Reply of the United States

### A. Commingled wastes/single harm: burden great

The Government argues that there is ample evidence in the record to establish that

the different intermingled hazardous substances at the Site present a single environmental harm of sediment contamination harmful to marine organisms and pose risks to human health. (Hale dep. at 39, 67.) Where there are commingled hazardous substances, the inquiry is factually complex and the defendants' burden is substantial. *See e.g., Alcan–Butler Tunnel,* 964 F.2d at 269; *In re Bell Petroleum,* 3 F.3d 889, 902–03 (5th Cir.1995) ("[E]ven where commingled wastes of unknown toxicity, migratory potential, and synergistic effect are present, defendants are allowed an opportunity to attempt to prove that there is a reasonable basis for apportionment (although they rarely succeed); where such factors are not present, volume may be a reasonable means of apportioning liability.").

### B. EPA's Division for Remediation Provides No Basis For Apportionment

The Government argues that the EPA divided the Harbor based on the status of source control: whether the sources of contamination were still producing contaminants. Sources near the shipyard apparently being controlled sufficiently allowed the EPA to clean up the WHOU without fear of future contamination, and that while the former woodtreating facility was still releasing PAHs and posed a threat to final cleanup in the EHOU, it was not likely to threaten the remedy in the WHOU.

The dividing line does not distinguish between different responsible parties, but it was drawn along a change in contamination gradients: a decrease in PAH concentrations in the central harbor where acute toxic effects from commingled sediment contaminants had not been documented. The Government emphasizes that both metals and PAHs are present throughout the Harbor above levels of concern, and that the variations in concentrations of metals and PAHs throughout the harbor cannot be used as the basis for apportioning the environmental harm. (Heinle Dec. ¶¶ 17, 18, 22, 23; Hale Dep. p. 44.) Moreover, the WHOU and the EHOU do not represent separate areas of biological impacts from the mercury and PAH contamination; it is impossible to trace any particular biological impact, or any biological impact in any specific location, to any specific harbor contaminant. Heinle Dec., ¶¶ 17, 18, 22, 12; Hale Dec., ¶ 10.

The EPA's selection of remedial actions provide no basis for apportioning harm between the WHOU and the EHOU. The EHOU was "capped" with clean sediments where biological testing confirmed that concentrations of commingled metals and PAHs posed an imminent threat to marine life. The harm to marine life cannot reasonably be attributed to individual contaminants within the commingled mass. (Heinle Dec., ¶¶ 17, 18, 22, 23.) EPA's final remedy includes capping, dredging, institutional controls, monitoring, and natural recovery. The remedial components are utilized in the harbor according to underwater terrain, habitat sensitivity, environmental conditions, and the nature and extent of contamination. Subtidal areas were capped in the most chemically contaminated area that would benefit most from the placement of clean sediment. Near the former shipyard, dredging was required where soils were more heavily contaminated with commingled metals and PAHs. Natural recovery was selected for limited intertidal areas and eel grass beds because they were less contaminated with metals and more likely to recover naturally.

The Government argues that if metals were the only contaminant present in the WHOU, and PAHs were the only contaminant present in the EHOU, it might be reasonable to use the two areas as a basis for apportioning the harm and the liability at the Site. At Eagle Harbor, over time, fish, tides, boats, and the like have caused metals, PAHs and sediments contaminated with both, to migrate throughout the harbor and become extensively commingled. (Heinle Dec., ¶¶ 17, 18, 22, 23; Hale Dec. ¶ 10.)

The Government again points to the fact that PACCAR would be released from any liability for the EHOU even though PACCAR contributed to the contamination in the EHOU and, thus, contributed to response costs there.

Concerning Wyckoff, the Government points out that this Court approved a settlement between the United States and Wyckoff

whereby Wyckoff's assets were liquidated and deposited in a fund for cleanup of the Wyckoff Operable Unit, and the EPA is not seeking the substantial remaining cost of the cleanup there from the State or PACCAR.

## ANALYSIS

The Report and Recommendation draws conclusions from important contested points. The Report and Recommendation (R & R) concludes without elaboration that there is a single harm—the contamination of Eagle Harbor. The R & R also recognized that there was contamination consisting of PAHs and mercury (it does not mention other metal contaminants reflected in EPA data) throughout the Harbor as well as the areas where these contaminants were concentrated.

The State and PACCAR have the burden of proof in moving to limit their liability by division of the environmental harm in accordance with what they caused. Rather than take up this burden, Defendants neither admit nor deny that there are commingled contaminants in Eagle Harbor, but point merely to the fact that there are different sources of contaminants around the Harbor, and that an artificial line between the East and West portions of the Harbor utilized by the EPA in effecting the initial stages of remediation indicates a reasonable basis for division of liability.

■ This case is not like *Broderick* where the two separate, unmixed plumes contaminating an aquifer were divisible geographically, because here there is merely a showing that there are areas where concentrations of contaminants are higher. To speak of concentrations of contaminants being higher in particular areas necessarily implies that the contaminants are elsewhere in lower concentrations. The Defendants' showing does not indicate that in areas outside the heavy concentrations of PAHs and mercury, the level of contamination is not harmful so as to rebut the EPA data.

There is likewise no showing that division is possible based on volume as in *In re Bell.* The PAHs and mercury concentrations in the two areas are bases for division advanced,

rather than an accounting of the volume of particular waste attributable to each Defendant.

■ Defendants appear to be making a case for two separate injuries. The *Restatement* provides an example as where two defendants independently shoot the plaintiff at the same time, one wounding him in the arm and the other wounding him in the leg. Division of harm is appropriate in such a case, according to the *Restatement,* even if certain elements of damages such as lost wages and pain and suffering may be difficult to apportion. But in failing to demonstrate that the concentrated pollutants have not fouled the entire Harbor to an injurious level, the Defendants have not made this case.

■ Defendants have likewise not made a case for successive harms similar to the *Restatement's* example of two defendants, independently operating the same plant, pollute a stream over successive periods of time. There, apportionment is proper, according to the *Restatement,* because it is clear that each has caused a separate amount of harm, limited in time, and that neither has any responsibility for the harm caused by the other. Different entities are involved with different types of hazardous waste.

■ The *Restatement* also provides analogies for a single harm that is divisible. Cattle owned by two or more persons trespass on the plaintiff's land and destroy his crops. The aggregate harm is the lost crop, which may be apportioned among the cattle owners on the basis of the number owned by each and the reasonable assumption that the respective harm done is proportionate to that number. Another example is where a stream is polluted by two or more factories, in which case the harm may be apportioned in terms of degree on the basis of evidence of the respective quantities of pollution discharged into the stream. While this example comes the closest to the Eagle Harbor situation, the problem is that the Defendants do not admit there is a single harm, or that there are commingled contaminants, or that they were responsible for certain volumes of specific material. They merely point to the EPA's initial clean-up efforts aimed at abat-

ing the worst problem and claim a geographic division is appropriate. This does not amount to carrying the burden of proof of the divisibility of the harm that a particular defendant caused.

With the Defendants neither admitting nor denying that there is a single harm from commingled contaminants (although one might easily infer a single harm from commingled contaminants from discussions of contamination levels), and relying greatly on the EPA's remediation methods with respect to certain concentrations of contaminants in certain areas, this is a poor showing on which to grant relief from joint and several liability.

A better case might be made for division according to each party's contribution of a particular contaminant akin the apportionment that occurred in *Hatco,* but the parties would have to make an evidentiary showing that their particular waste necessitated a discrete clean-up effort apart from that required for any other party's waste. The parties may not properly rely on the United States to supply the evidence that they are required to produce concerning their own contribution to the causation of harm. The concern over PACCAR escaping liability for any of its waste in the EHOU highlights this problem; its waste would have to be cleaned up in the EHOU, but it would not be responsible for that EHOU clean-up if its liability were limited geographically.

The State and PACCAR have failed to make a proper showing for limitation of their liability based on geographic divisibility. Rather than parties avoiding liability entirely for particular areas, equitable allocation of response costs among the parties at a later stage may be more appropriate.

Accordingly, it is hereby

ORDERED: The United States' objections to the Report and Recommendation are sustained, and the Motions of the State of Washington and PACCAR for Summary Judgment on Divisibility of Harm are DENIED.