COOPER INDUSTRIES, INC.; Keystone Consolidated Industries, Inc.; The Monarch Machine Tool Co.; Niagara Mohawk Power Corporation; Overhead Door Corporation, Plaintiffs,

v.

AGWAY, INC.; BMC Industries, Inc.; Borg–Warner Corporation; Elf Atochem North America, Inc.; Mack Trucks, Inc.; Motor Transporation Services, Inc.; Pall Trinity Micro Corporation; The Raymond Corporation; Redding–Hunter, Inc.; Rotelcom, Inc.; Sola Basic Industries, Inc.; Wilson Sporting Goods, Inc.; Philip A. Rosen; Harvey M. Rosen; City of Cortland; and New York State Electric and Gas Corporation, Defendants.

No. 92–CV–0748.

United States District Court,
N.D. New York.

Nov. 17, 1997.

O'Connor, Gacioch & Pope, (Thomas F. O'Connor, Alan J. Pope, of counsel), Binghamton, NY, for plaintiffs.

Howrey & Simon, (Reed W. Neuman, of counsel), Washington, DC, for defendant Pall Trinity Micro.

Nixon, Hargrave, Devans & Doyle,(Margaret A. Clemens, of counsel), Rochester, NY, for defendant The Raymond Corp.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

### A. Procedural History

This is a CERCLA case. Presently before the Court are three motions. First, defendant Paul Trinity Micro Corp. ("PTM") moves, pursuant to 28 U.S.C. § 1292(b), to certify for appeal this Court's Memorandum–Decision & Orders of February 27, 1997 and April 17, 1997. Specifically, PTM argues that these Orders raise controlling issues of law arising from the Court's refusal to consider two affidavits submitted by PTM in support of its summary judgment motion. PTM also desires to address on immediate appeal the issue of whether a potentially responsible party may bring cost recovery actions under CERCLA § 107.

Second, plaintiffs move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, against defendant The Raymond Corporation ("Raymond") on the issue of liability for response costs at the so-called Rosen site. Raymond, in turn, opposes the motion, arguing that genuine issues

of material fact preclude the granting of summary judgment on the issue of liability.

Third, Raymond cross-moves to dismiss plaintiffs' CERCLA claims and state law claims.

For the reasons stated below, the Court hereby certifies for appeal its Memorandum–Decision & Orders of February 27, 1997 and April 17, 1997. Furthermore, plaintiffs' motion for summary judgment against Raymond on the issue of liability is GRANTED. Lastly, Raymond's cross-motion to dismiss the plaintiffs' CERCLA claims is DENIED in its entirety, and further, Raymond's motion to dismiss plaintiffs' state law claims is GRANTED IN PART and DENIED IN PART, to the extent stated herein.

## B. Facts

### 1. Plaintiffs' Motion for Summary Judgment and Raymonds' Cross–Motion to Dismiss

The facts of this case are well-known to the parties and the Court, and are set forth in the relevant sections of the decision below.

By way of an overview, the plaintiffs have been and currently are paying the costs of removal and the costs of the remedial investigation at the Rosen Superfund Site, pursuant to a number of Administrative Orders on Consent issued by the EPA. The costs to date exceed $1.9 million.

The Court has previously found that (1) the plaintiffs have incurred response costs due to the release of hazardous substances at the Rosen site; (2) the response costs are consistent with the National Contingency Plan; (3) the Rosen site is a "facility" within the meaning of CERCLA; and (4) hazardous substances were released at the Rosen site. *See* Memorandum–Decision and Order of this Court, dated August 25, 1995. Thus, the remaining issue to be determined with respect to plaintiffs' motion for summary judgment against Raymond on the issue of liability is whether Raymond is a "responsible party" under CERCLA.

To that end, plaintiffs claim that Raymond arranged for the disposal of the steel scrap and aluminum scrap with the Rosen Broth-ers. Plaintiffs also claim that the waste, which allegedly contains CERCLA hazardous materials, was disposed of at the Rosen site, and that the hazardous substances of the sort contained in Raymond's waste were found at the Rosen site.

Raymond disputes all of these assertions, responding that: (1) plaintiffs' expert affidavit should be excluded because it lacks a proper foundation for its conclusions and opinions; (2) it did not dispose of steel at the Rosen site; (3) its steel is not a hazardous substance from which there was a release; and alternatively, (4) it is not liable for releases of any substances from scrap metal because its share of divisible harm is zero.

Raymond also contests the sufficiency of the Complaint, arguing that: (1) plaintiffs fail to state a claim under CERCLA § 107 because private responsible parties cannot bring cost recovery actions pursuant to § 107; (2) CERCLA cannot be applied retroactively; (3) CERCLA is unconstitutional under the Commerce Clause; and (4) plaintiffs' state law claims should be dismissed.

### 2. PTM's Motion for Interlocutory Appeal

The following facts are relevant for purposes of deciding PTM's motion for interlocutory appeal.

On November 13, 1996, PTM's attorney, Reed Neuman, telephoned plaintiffs' attorney, Alan Pope, to request additional time to serve PTM's reply papers in connection with its motion for summary judgment. A conference call was then placed to the Court by Neuman and Pope. The parties discussed PTM's request for a time extension with my law clerk. PTM requested the time extension because of problems associated with the preparation of its expert affidavits.

During that telephone conference, the Court granted PTM leave to file the identified expert affidavits and Memorandum of Law one-week late. The parties also agreed that the existing motion package as briefed would be filed with the Court immediately, with a cover letter specifically identifying the papers PTM would be filing one-week later. Importantly, the Court did not grant PTM

leave to file any supporting document it wished as part of its late reply. Rather, leave was granted only in regard to the late filing of the expert affidavits and Memorandum of Law.

According to PTM, however, the Court granted PTM a one-week extension to file any supporting materials with its reply papers. Further, PTM contends that the Court did not condition the PTM filing extension upon PTM specifically identifying the papers to be filed in the cover letter filed with the existing motion package.

On November 15, 1996, Pope prepared a cover letter to the Court setting forth the documents being filed, which also identified the specific documents that PTM would be separately filing one-week later. Prior to preparing the cover letter, Pope spoke with Neuman over the telephone concerning the documents PTM would be filing. Neuman informed Pope that he would be filing several expert affidavits. At no time was the subject of any other supporting materials discussed.

After receiving a copy of the cover letter filed with the Court, Neuman telephoned Pope, but Pope was not available. According to Neuman, he left Pope a voice mail message expressing his concern that because Pope's cover letter listed only the three expert affidavits, it suggested that PTM would not be submitting additional materials to the Court. Neuman's message also stated that he believed PTM could file whatever additional materials it deemed appropriate in addition to the three expert affidavits listed for filing in the cover letter.[1]

On November 22, 1996, PTM filed its reply papers within the one-week extension granted by the Court. The papers included a cover letter listing all the materials filed by PTM, including the affidavits of Rosen and Scott. Thereafter, plaintiffs' filed a letter with the Court requesting that the Rosen and Scott affidavits be rejected. Plaintiffs argued that, because PTM had not been

granted permission to file these two affidavits, and that because the affidavits had not been identified by PTM for inclusion in the cover letter filed with the motion package, the affidavits should not be considered.

In a letter to the Court dated December 2, 1996, PTM responded by arguing that the Court had granted it permission to file its entire reply package late (not just the expert affidavits), and that PTM had not been required by the Court to specifically identify the supporting papers to be filed for inclusion in the cover letter filed with the motion package.

This letter by Neuman was followed by a telephone conversation between Neuman and the Court on December 4, 1996. According to Neuman, Benisson stated that the Court "would accept the papers as filed." Thus, Neuman contends that it was his understanding that the Court would consider all the supporting papers filed with PTM's reply.

However, as stated by this Court in its Memorandum–Decision and Order of April 17, 1997, the Court did not tell Neuman that it "would accept the papers as filed." To the contrary, the Court told Neuman that "it would permit the *filing* of all papers in relation to PTM's reply, but would determine if the additional papers would be considered when the Court reviewed the file for decision."

When the Court reviewed the file for decision, the Court decided not to accept the Scott and Rosen affidavits, because PTM had not previously identified these affidavits to the Court, and thus the affidavits were untimely under Local Rule 7.1(b)(3).

The Court now turns to address the issues presented.

## II. DISCUSSION

### A. PTM's Motion For Certification

A party seeking leave to appeal a district court's interlocutory order must first obtain

---

1. Neuman asserts that he then received a phone call from Pope's assistant, Rose Affuso, confirming his understanding of the Court's directive that he could file additional materials. However, plaintiffs dispute that either Affuso or anyone else granted Neuman authority to disobey the specific terms of the Court's directive to permit Neuman to file additional materials not previously identified to the Court, nor disclosed in the cover letter filed by the plaintiffs with the existing motion package.

certification from that court pursuant to 28 U.S.C. § 1292(b). In order to certify, the district court must find that: (1) the order "involves a controlling question of law"; (2) "as to which there is substantial ground for difference of opinion"; and that (3) "appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

 This provision was designed as an exception to the general policy against piecemeal appellate review embodied in the final judgment rule, and is reserved for cases where the decision of appeal might avoid protracted and expensive litigation. *See, e.g., Koehler v. The Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir.1996) (stating that "it is a basic tenet of federal law to delay appellate review until a final judgment has been entered"). Accordingly, district courts should "exercise great care in making a § 1292(b) certification." *Westwood Pharmaceuticals, Inc. v. National Fuel Gas Dist. Corp.*, 964 F.2d 85, 89 (2d Cir.1992).

In the present case, PTM argues that there are three controlling questions of law arising from the Court's Memorandum–Decision & Orders of February 27, 1997 and April 17, 1997, sufficient to warrant certification for immediate appeal. According to PTM, these issues are:

(1) whether the requirements of Northern District Local Rule 7.1(b) and Rule 56 of the Federal Rules of Civil Procedure permit a District Judge to refuse to consider affidavits in support of a pleading on summary judgment as untimely filed, without first providing the party against whom the refusal is directed the opportunity to demonstrate the existence of good cause why the affidavits should be considered;

(2) whether a District Judge, in permitting the late filing of a summary judgment pleading, has the authority under General Order 41 and Rule 56, Fed.R.Civ.P., to issue a directive that only certain supporting affidavits will be permitted, even if all the affidavits independently comply with the requirements of Rule 56(e); and

(3) whether potentially responsible parties may bring cost recovery actions under CERCLA § 107.

### 1. Questions 1 and 2 are Both Unsuitable for Immediate Appeal

 Turning to the first issue raised by PTM—whether a district court must give a party the opportunity to demonstrate good cause before rejecting untimely papers—the Court finds this issue to be unsuitable for immediate appeal.

Local Rule 7.1(b)(3) states:

Any papers required under this Rule that are not timely filed or are otherwise not in compliance with this Rule shall, unless for good cause shown, not be considered. Failure to file or serve any papers as required by this Rule shall, unless for good cause shown, be deemed by the court as a consent to the granting or denial of the motion as the case may be.

By its terms, Local Rule 7.1(b)(3) places the onus on a party filing untimely papers to show good cause for their consideration. If a party fails to show good cause, Local Rule 7.1(b)(3) requires that the papers not be considered. The rationale for rules like Local Rule 7.1(b)(3) is plain: "[I]f the rule were otherwise, enlargements of time would be idle ceremony, and the lawyers, not the judge, would be running the docket." *Mendez v. Banco Popular de Puerto Rico*, 900 F.2d 4, 8 (1st Cir.1990).

In the instant case, PTM has not been deprived of the opportunity to make a showing of good cause why the Rosen and Scott affidavits should have been considered. As the facts reveal, PTM requested from the Court a one-week extension to file expert affidavits in connection with its reply papers. PTM represented that the "good cause" for this request were problems associated with preparing these expert affidavits. The Court granted PTM permission to file these identified expert affidavits, along with a Memorandum of Law, one-week late. The Court also directed PTM to specifically identify the papers to be filed in the cover letter filed with the existing motion package. The Court did not grant PTM blanket permission to file any papers it wished.

PTM failed to adhere to that directive, and accordingly, the Court did not consider the

Rosen and Scott affidavits in ruling on the summary judgment motion. If PTM desired the Court to consider these additional affidavits not discussed with the Court, PTM should have identified these affidavits to the Court, as it did with the expert affidavits, and explained why a time extension was necessary.

PTM argues, however, that this Court granted it permission to file late not only the expert affidavits, but whatever other supporting materials it would be filing in its reply. PTM is mistaken. As stated in this Court's Memorandum–Decision & Order of April 17, 1997, the Court

> did not permit PTM to file any document it wished as part of its late reply. Rather, the Court permitted PTM to file those papers identified to the Court. The reason given to the Court for the need for an extra week was a problem relating to the preparation of expert witness affidavits. PTM specifically identified two expert affidavits and a memorandum of law that it intended to file in reply. The Rosen and Scott affidavits were not identified to the Court.

In any event, PTM still had ample opportunity to show good cause for the untimely filing of the Scott and Rosen affidavits. For instance, PTM sent a letter to the Court dated December 2, 1996, explaining its confusion surrounding the Court's directive. In that letter, PTM argued that the Scott and Rosen affidavits should nonetheless be considered timely. Additionally, PTM telephoned the Court on December 4, 1996, explaining its misunderstanding of the Court's directive, and thus why the Scott and Rosen affidavits had not been included in the cover letter filed with the motion package. PTM thus had these opportunities to show good cause why the affidavits should be consid-

ered. If PTM desired to further discuss the matter with the Court, PTM could have done so.

PTM steadfastly argues that during the December 4, 1996 telephone conversation with the Court, it was told that all the affidavits would be considered. Again, however, PTM is incorrect. In any case, any confusion arising from that telephone conversation did not, in any way, negate the opportunities PTM had to explain to the Court why the Rosen and Scott affidavits should be accepted. Accordingly, the Court cannot agree that PTM did not have an opportunity to show good cause why the affidavits should be considered.

Finally, Local Rule 7.1(b)(3) places the responsibility of making a good cause showing on the party seeking to file untimely papers. If PTM is suggesting that courts must conduct an inquiry, such as holding a hearing, prior to deciding whether to accept or reject untimely papers, PTM is wrong. Any such requirement would defeat the purpose of rules such as Local Rule 7.1(b)(3), which, among other things, set submission deadlines to provide guidance to the parties and to ensure the orderly procession of cases.[2]

Accordingly, the Court finds that the first issue raised by PTM fails to identify any issue from which there exists a substantial difference of opinion.

■ In the same vein, the second issue raised by PTM—whether a district judge has the authority under General Order 41[3] and Rule 56 of the Federal Rules of Civil Procedure to issue a directive that only certain supporting affidavits will be considered—presents a non-issue. There is no question that courts have discretion to grant parties permission to file untimely papers upon a showing of good cause. *See, e.g.,* Local Rule

---

2. PTM cites to *Daniels v. Anheuser–Busch, Inc.,* 1997 WL 43629, at *1, 1997 U.S. Dist. LEXIS 990, at *2 (N.D.N.Y. January 28, 1997) to support its position. In that case, the court *sua sponte* issued an order to show cause why a party's untimely papers should be considered. This Court agrees that, under certain circumstances, a court may exercise its discretion and issue an order to show cause why untimely papers should be considered. However, this Court

disagrees that *Daniels* can be fairly read to *require* courts to furnish any party such a forum prior to deciding whether to consider untimely papers. Indeed, any argument for imposing such a "requirement" plainly is rebutted by both the language of Local Rule 7.1(b)(3) and the common sense policies that Rule embodies.

3. General Order 41 is now incorporated into Local Rule 7.1.

7.1(b)(3); *Davidson v. Keenan,* 740 F.2d 129, 132 (2d Cir.1984); *Wood v. Santa Barbara Chamber of Commerce, Inc.,* 705 F.2d 1515, 1519 (9th Cir.1983), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1446, 79 L.Ed.2d 765 (1984). This discretion permits courts to balance the importance of untimely papers against the possible prejudice, if any, to the opposing party. *See, e.g., In Re: Roussopoulos,* 198 B.R. 33, 44 n. 8 (Bkrtcy. E.D.N.Y.1996).

In this case, this Court exercised its discretion in deciding not to accept the Rosen and Scott affidavits. As discussed above, PTM requested a time extension because of problems associated with the preparation of its expert affidavits. On that basis, the Court granted PTM a one-week extension. PTM never discussed with the Court the Rosen or Scott affidavits. Neither did PTM notify the Court in the cover letter filed by the plaintiffs with the existing motion package that the Rosen and Scott affidavits would be filed. Accordingly, the Court determined that these affidavits were untimely under Rule 7.1(b)(3), and thus exercised its discretion in deciding not to consider them.

■ Further, PTM fails to cite any case law in support of its position that a court cannot issue a directive accepting some papers and rejecting others. Instead, PTM tellingly argues that the affidavits should have been considered by the Court, citing to several cases where courts have, in contrast to this case, exercised their discretion to consider untimely affidavits. However, this argument fails to address the very issue that PTM itself has posed. In short, because PTM's argument is contrary to the dictates of Local Rule 7.1(b)(3), and because no case authority supports PTM's position, the Court finds that there is not substantial grounds for differing opinion with respect to the second issue raised by PTM. Accordingly, this issue also is improper to certify for interlocutory appeal.

■ Lastly, it should be noted that PTM also fails to satisfy the third requirement for certification with respect to either of the first or second questions it raises. To certify, a party must show that immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). This requirement is met if "appeal promises to advance the time for trial or to shorten the time required for trial." 16 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3930 at 432 (2d ed.1996). As noted recently by the Second Circuit, "section 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation." *Koehler,* 101 F.3d at 865.

■ In this case, an immediate appeal and reversal would not dispose of the plaintiffs claims against PTM. *Cf. In re Lloyd's American Trust Fund Litigation,* 1997 WL 458739, *7 (S.D.N.Y. Aug.12, 1997) (finding certification of forum selection clauses to be appropriate because reversal would lead to dismissal of case). Indeed, as plaintiffs argue, PTM would still be liable for its disposal of scrap metal at the Rosen site, as the Rosen and Scott affidavits address only the issue of liquid waste. Further, contrary to PTM's arguments, impairment of settlement negotiations does not provide a basis for certification. *See, e.g., Strougo v. Padegs,* 1997 WL 473566, *8 (S.D.N.Y. Aug.18, 1997) (stating that "if a likelihood of settlement were a basis for certifying interlocutory orders for appeal, the 'floodgates' to piece-meal appeals would truly be opened, for the vast majority of all civil cases settle before a final judgment and often after resolution of dispositive motions").

■ The Court is further mindful that "district courts [should] exercise great care in making a § 1292(b) certification." *Westwood Pharmaceuticals, Inc.,* 964 F.2d at 89. Only "exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351 (1978). Here, the first and second issues raised by PTM do not present such an instance.

### 2. Question 3 is Suitable for Immediate Appeal

The third issue raised by PTM—whether potentially responsible parties ("PRPs") may bring cost recovery actions under CERCLA

§ 107—satisfies the three requirements of § 1292(b).

### a) Controlling Issue of Law

■ "A controlling issue of law need not necessarily terminate an action in order to be controlling." *New York Racing Ass'n, Inc. v. Perlmutter Publishing, Inc.*, 959 F.Supp. 578, 583 (N.D.N.Y.1997) (citing *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir.1990)). "It only has to be an issue that could materially affect the outcome of the case." *Id.* (citations omitted).

■ In this case, plaintiffs do not contest that the third issue raised by PTM presents a controlling question of law. It is apparent why, for if PRPs such as the plaintiffs are not entitled to bring § 107 claims, this case would be proceeding pursuant to § 113. This is significant because sections 107 and 113 are not coterminous. These sections, in fact, differ with respect to the nature of liability imposed, applicable burdens of proof and available equitable defenses. Thus, a determination that PRPs cannot assert § 107 claims may materially affect the outcome of this litigation.

### b) Substantial Ground for Difference of Opinion

■ Plaintiffs also concede that there is substantial ground for difference of opinion on this issue. The Second Circuit has yet to address the issue. Disagreement is present among the district courts of this Circuit. *Idylwoods Assocs. v. Mader Capital*, 915 F.Supp. 1290, 1314 (W.D.N.Y.1996) (holding PRPs may bring § 107 claims); *Companies for Fair Allocation v. Axil Corp.*, 853 F.Supp. 575, 578–80 (D.Conn.1994) (same) *Town of New Windsor v. Tesa Tuck, Inc.*, 919 F.Supp. 662, 679–81 (S.D.N.Y.1996) (opposite). Other circuits have held that PRPs may not bring cost recovery actions under § 107. *United Technologies Corp. v. Browning–Ferris Indus., Inc.*, 33 F.3d 96, 100–01 (1st Cir.1994), *cert. denied*, 513 U.S. 1183, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir.1994); *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 935–38 (8th Cir.1995); *United States v. Colorado and Eastern R. Co.*, 50 F.3d 1530, 1534–36 (10th Cir.),; *Redwing Carriers, Inc. v. Saraland Apts.*, 94 F.3d 1489, 1496 (11th Cir.1996). Indeed, the issue has generated much discussion from scholars. *See* Michael V. Hernandez, *Cost Recovery or Contribution?: Resolving the Controversy over CERCLA Claims Brought by Potentially Responsible Parties*, 21 HARV. ENVTL.L. REV. 83 (1997) (discussing inconsistent approaches taken by courts, and offering a solution); Jose R. Allen and Karen L. Peterson, *Private Party Litigation under Superfund: Claims for Cost Recovery and Contribution*, SB91 ALI–ABA 663 (1997).

Accordingly, there exists substantial ground for difference of opinion with respect to this issue.

### c) Materially Advance the Ultimate Termination of the Litigation

It is as to the final requirement under § 1292(b) that both sides differ. As an initial matter, plaintiffs argue that PTM's request for certification under § 1292(b) is untimely, because parties are required to apply to a district court for certification within 10 days of entry of the order they seek to certify. According to the plaintiffs, PTM did not make application for certification within 10 days of either of the orders it now seeks to certify.

■ Plaintiffs' argument, however, misunderstands how § 1292(b) works. Under § 1292(b), permission for an appeal must be sought and obtained from two courts—the district court rendering the order and the Court of Appeals. If a district court certifies an order, the Court of Appeals may permit appeal "if application is made to it within ten days after the entry of the order." 28 U.S.C. § 1292(b). Thus, the 10–day clock does not begin to tick until the district court has certified the order to the circuit court. It does not begin to run, as plaintiffs assert, before certification has occurred. *See, e.g., Marisol v. Giuliani*, 104 F.3d 524, 527 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 1694, 137 L.Ed.2d 821 (1997); 16 CHARLES A. WRIGHT & ARTHUR A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3929, at 394 (2d ed. 1996) ("The ten-day limit for seeking permission to appeal runs from entry of the district court order certifying the underlying order

for appeal, not from entry of the underlying order itself.").

Plaintiffs next argue that even if an appellate court reverses this Court's decision to allow PRPs to assert § 107 claims, that reversal would not terminate this matter. Instead, plaintiffs posit that the suit would proceed pursuant to the § 113 claim.

PTM, in turn, concedes that termination will not result. However, PTM asserts that termination is not dispositive; rather, courts may consider other factors in examining this element, including whether review may avert waste, delay or clarify the rights of parties.

■■■ This Court agrees with PTM. If this issue is later resolved differently, continued proceedings pursuant to plaintiffs' § 107 claim may be wasteful, as § 113 claims are not interchangeable with § 107 claims. *See In re Victory Markets, Inc.,* 195 B.R. 9, 13–14 (N.D.N.Y.1996) (applying criterion of waste of time and delay of proceedings). Further, appellate review would immediately clarify the rights of the respective parties in this case. *See Maestri v. Westlake Excavating Co., Inc.,* 894 F.Supp. 573, 577 (N.D.N.Y. 1995) (applying criterion of whether decision clarifies parties' rights). In short, a decision on this controlling issue of law may advance the ultimate termination of the case.

■■■ Accordingly, the Court finds that the third issue raised by PTM is suitable for immediate appeal. As such, certification is granted with respect to the Court's Memorandum–Decision & Orders of February 27, 1997 and April 17, 1997.[4]

## B. Raymonds' Motion to Dismiss

### 1. Failure to State a § 107 Claim, CERCLA Retroactivity and CERCLA in Relation to the Commerce Clause

Defendant Raymond cross-moves to dismiss on the grounds that PRPs cannot bring § 107 claims, that CERCLA does not apply retroactively and that CERCLA is unconstitutional under the Commerce Clause of the federal constitution.

These issues previously have been litigated before the Court in the summary judgment motions relating to the defendant Mack Trucks, Inc. The Court subsequently heard oral argument and rendered a written decision. *See Cooper v. Agway,* 1996 WL 550128 (Sept. 23, 1996). The Court held that the plaintiffs' Complaint was viable, that CERCLA applied retroactively and that CERCLA did not violate the Commerce Clause.

■■■ "The law of the case doctrine 'posits that when a Court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *DiLaura v. Power Auth. of N.Y.,* 982 F.2d 73, 76 (2d Cir.1992) (quoting *Liona Corp. v. PCH Assocs. (In Re PCH Assocs.),* 949 F.2d 585, 592 (2d Cir.1991)) (further citation omitted). As the issues listed above previously have been decided by this Court, they constitute law of the case, and will not be revisited herein. Raymond is referred to the Court's reasoning in its September 23, 1996 Memorandum–Decision and Order for an extended discussion of these issues.

### 2. State Law Claims[5]

Raymond also moves to dismiss plaintiffs' supplemental state law claims of (1) unjust enrichment/restitution, (2) negligence and (3) New York State navigation law.

Plaintiffs' claim of unjust enrichment/restitution asserts that, because plaintiffs have assumed certain obligations to remediate the Rosen site, Raymond is being unjustly en-

---

4. This Court recognizes, however, that if the Second Circuit accepts certification of the February 27, 1997 and April 17, 1997 Orders, *see* 28 U.S.C. § 1292, its jurisdiction is not confined to the exact question that either this Court or the parties have identified as controlling. Rather, its jurisdiction extends to all issues arising from the these Orders, as district courts do not certify issues for appeal, but rather they certify orders.

*United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1156–57 (2d Cir.1986); *Capital Temporaries, Inc. of Hartford v. Olsten Corp.,* 506 F.2d 658, 660 (2d Cir.1974).

5. Congress chose not to preempt state statutory or common law actions in enacting the liability sections of CERCLA. 42 U.S.C. § 9614(a).

riched because it has not and presently is not contributing to the clean up of the Rosen site. Raymond, by contrast, contends that, pursuant to an Administrative Order on Consent with the EPA dated January 4, 1990, plaintiffs have a duty to participate in the clean up of the Rosen site. Accordingly, Raymond cites to cases holding that, in a CERCLA case, plaintiffs cannot recover under an unjust enrichment/restitution claim when it has a duty to clean up the contaminated site.

There are three elements of a claim for unjust enrichment: (1) defendant was enriched, (2) enrichment was at plaintiff's expense and (3) the circumstances were such that equity and good conscience require defendant to make restitution. *See, e.g., Golden Pacific Bancorp v. Federal Deposit Insurance Corp.,* 1997 WL 626374, at *3 (S.D.N.Y. Oct.7, 1997). Other district courts have held that unjust enrichment claims should be dismissed in CERCLA cases when, as here, plaintiffs have a duty, pursuant to an administrative order, to clean up the contaminated site. *Ciba–Geigy Corp. v. Sandoz, Ltd.,* 916 F.Supp. 404 (D.N.J.1995); *Nielsen v. Sioux Tools,* 870 F.Supp. 435, 443 (D.Conn.1994); *Mayor v. Klockner & Klockner,* 811 F.Supp. 1039, 1058–1059 (D.N.J. 1993); *Smith Land & Improvement Corp. v. Rapid–American Corp.,* 18 Envtl. L. Rep. 20769, 20770, 1987 WL 56461 (M.D.Pa.1987), *vacated on other grounds, Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). These cases reason that a defendant is not enriched simply because the EPA may order a plaintiff to remediate a site. *Id.*

This Court agrees with the reasoning set forth in these cases. Thus, plaintiffs' claim against Raymond for unjust enrichment/restitution is dismissed.

Raymond next seeks to dismiss Plaintiffs' negligence claim on the ground that manufacturers do not owe a duty to other manufacturers to safely and properly dispose of their waste. Plaintiffs, in turn, assert that Raymond had a duty to safely dispose of its hazardous waste, and that whether that duty is broad enough to run to the plaintiffs is a question for the jury.

It is hornbook law that the issue of the existence of a duty is a question of law to be decided by the court. W. Page Keeton, Prosser And Keeton On Torts § 37, at 236 (5th ed.1984). If the court finds that the facts as alleged impose a duty, it is then within the province of the jury to determine whether the plaintiff has proven the facts which give rise to the duty. *Id.* As such, this Court must decide whether there exists a duty in this case.

After reviewing the cases in which plaintiffs have asserted supplemental state law negligence claims in a CERCLA action, it is apparent to the Court that the claims were brought by *owners* of the contaminated site. *See ABB Industrial Systems, Inc. v. Prime Technology, Inc.,* 120 F.3d 351, 354 (1997); *Fisher Development Co. v. Boise Cascade Corp.,* 37 F.3d 104, 107 (3d Cir.1994); *Prisco v. State of New York,* 1996 WL 596546 (S.D.N.Y. Oct.16, 1996). Neither the parties nor the Court can find any cases where a court, applying New York law, has ruled on the viability of a negligence claim asserted against a generator of hazardous waste by *other manufacturers* who are PRPs that have been ordered by the EPA to clean up the contaminated site.

Accordingly, this Court will not create or extend New York law to recognize such a novel duty; that is the bailiwick of New York's courts and legislature. *See, e.g., City of Johnstown, New York v. Bankers Standard Ins. Co.,* 877 F.2d 1146, 1153 (2d Cir.1989) ("[o]ur role as a federal court sitting in diversity is to construe and apply state law as we believe the state's highest court would, not to adopt innovative theories that may distort established state law.") (internal citations omitted). Thus, plaintiffs' negligence claim against Raymond is dismissed.[6]

---

6. In any case, the statute of limitations would bar the negligence claims of plaintiffs Keysone, Monarch and Niagara. As explained by the Second Circuit:

Lastly, Raymond moves to dismiss plaintiffs' remaining state law claim brought pursuant § 181(1), Article 12 of the New York State Oil Spill Prevention, Control, and Compensation Act ("Navigation Law"). A claim arises under Navigation Law § 181(1) if a party has "discharged petroleum."

In the present case, plaintiffs' Complaint alleges that Raymond discharged petroleum at the Rosen site. Further, Raymond's own expert states in his affidavit that the steel used by Raymond would have been thinly coated with oil. This evidence is enough to defeat Raymond's motion to dismiss.

### C. Plaintiffs' motion for Summary Judgment

Plaintiffs move for summary judgment against Raymond on the issue of CERCLA liability at the Rosen site.

The standard for summary judgment is well-settled. A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of "informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). The initial burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

The nonmoving party may defeat the summary judgment motion by producing sufficient evidence to establish a genuine issue of

material fact for trial. *See id.* at 322, 106 S.Ct. at 2552. The test for existence of a genuine dispute is whether a reasonable juror could find for the nonmoving party; that is, whether the nonmovant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

In ruling on a motion for summary judgment, a Court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs.*, 834 F.2d 54, 57 (2d Cir.1987). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Indeed, the nonmoving party's opposition may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (citations and quotations omitted).

### 1. CERCLA Liability

Liability under CERCLA is imposed when a plaintiff establishes the following five elements: (1) the defendant falls within one of the four categories of "responsible parties" enumerated in § 107(a), 42 U.S.C. § 9607(a); (2) the site of the clean-up is a facility under § 101(9), 42 U.S.C. § 9601(9); (3) there is a release or threat-

[u]nder 42 U.S.C. § 9658, if a claim is brought under state law for property damages caused by hazardous substances and state law does not provide a discovery rule, the state statute of limitations cannot begin to run until the plaintiff knew or should have known that the damages were caused by hazardous chemicals. *ABB Industrial Systems, Inc. v. Prime Technology, Inc.*, 120 F.3d 351, 360 (2d Cir.1997). Here, New York law provides for a discovery rule un-

der CPLR § 214–C. Thus, plaintiffs had three years from the date they knew or should have known of the injury to property to bring the claim. Assuming that the cause of action accrued when the EPA issued Administrative Orders to plaintiffs Keystone, Monarch and Niagara in 1988 and 1989, their negligence claims would be barred because the Complaint was not filed within three years of discovery of the injury to property.

ened release of hazardous substances at the facility; (4) as a result of which plaintiff has incurred response costs; and (5) the costs incurred conform to the National Contingency Plan ("NCP") under § 107(a)(4) as administered by the EPA. *See U.S. v. Alcan Aluminum Corp.*, 990 F.2d 711, 719–20 (2d Cir. 1993) (citing *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992)). "If the [plaintiffs] establish[ ] each of these elements on undisputed facts, and the defendant is unable to demonstrate by a preponderance of the evidence the existence of one of the three affirmative defenses set forth in § 9607(b), then [the plaintiffs are] entitled to summary judgment on the issue of liability, even when genuine issues of material fact remain as to appropriate damages." *U.S. v. Alcan Aluminum Corp.*, 990 F.2d at 720 (citing *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989)).

CERCLA is a strict liability statute, and imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment" of hazardous substances "from which there is a release, or a threatened release which causes the incurrence of response costs." 42 U.S.C. § 9607(a)(3) and (4). As explained by the Second Circuit, "[t]he plain meaning of this language dictates that [a plaintiff] need only prove: (1) there was a release or threatened release, which (2) caused incurrence of response costs, and (3) that the defendant generated hazardous waste at the clean-up site. What is not required is that [a plaintiff] show that a specific defendant's waste *caused* incurrence of clean-up costs." *Alcan*, 990 F.2d at 721 (emphasis added).

 As to what constitutes a hazardous substance, CERCLA defines the term "by cross-referencing several other environmental statutes."[7] *See* 42 U.S.C. § 9601(14). Significantly, the Act expressly refers to any such substance, and imposes no quantitative requirement. *Alcan*, 990 F.2d at 720.

The Court need not discuss each element of CERCLA liability at this time. It already has been determined by this Court that: (1)

there was a release of hazardous substances at the Rosen site; (2) that the Rosen site is a "facility" within the meaning of CERCLA; (3) that the plaintiffs have incurred response costs due to the release of hazardous substances at the Rosen site; and (4) that the response costs incurred by the plaintiffs are consistent with the NCP. *See* August 25, 1995 Memorandum–Decision and Order of this Court. Accordingly, the Court, for the purposes of deciding the present summary judgment motion, must consider whether the record raises a material factual issue as to whether Raymond is a responsible party.

### a) Responsible Party

Under CERCLA, responsible parties include

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). Further, 42 U.S.C. § 9601(29) defines "disposal" for purposes of CERCLA by incorporating the definition provided in the Solid Waste Disposal Act, 42 U.S.C. §§ 6901–92 (SWDA). As stated by the SWDA:

> [t]he term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into the water, including ground water.

42 U.S.C. § 6903(3). Thus, to meet their burden, the plaintiffs in this case must show that Raymond arranged in some manner to have its waste transported to the Rosen site, that such waste was transported to the site, that the waste contained hazardous sub-

---

**7.** Any substance listed in the following: Clean Water Act, CERCLA § 9602, § 3001 of the Solid Waste Disposal Act, § 307(A) of the Clean Water

Act, § 112 of the Clean Air Act, and any imminently hazardous chemical substance or mixture with respect to which the EPA has taken action.

stances and that those same substances were found at the site.

Plaintiffs seek to impose liability on Raymond for the alleged dumping of two types of scrap metals at the Rosen site; namely, (i) scrap steel and (ii) scrap aluminum. Each of these metals will be discussed in turn.[8]

### i) Scrap Steel

Initially, the Court notes that Raymond does not dispute that its manufacturing process resulted in scrap steel. Nor does it contest that some of this scrap was in the form of skeletons, which it referred to as heavy metal scrap due to its size, and that some of the scrap steel was in the form of steel turnings. Raymond also concedes that from September 1975 to January 1983, the Rosen Brothers purchased Raymond's scrap steel, and that this scrap was transported to and temporarily stored at the Rosen site.

Plaintiffs have the initial burden of showing that the scrap steel was "disposed of" at the Rosen site. *See* Fed.R.Civ.P. 56; 42 U.S.C. § 9607(a)(3). Accordingly, plaintiffs cite the Court to Raymond's admissions, the deposition testimony of Raymond's employees that the Rosens hauled away the scrap steel, the deposition testimony of Philip Rosen that the scrap steel was dumped at the Rosen site and the expert affidavits of Ball that the scrap steel may have released hazardous substances into the environment. This evidence is sufficient to satisfy plaintiffs' burden.

In attempting to rebut this showing, Raymond asserts that, because it sent the scrap steel to the Rosen site for temporary "storage" before it was resold by Rosen, it did not "dispose" of the scrap steel within the meaning of CERCLA. *See* 42 U.S.C. § 6903(33) (stating that term "storage," when used in connection with hazardous waste, means "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous substances."); *see also United States v. Amtreco,* 809 F.Supp. 959, 965

(M.D.Ga.1993) (stating that "mere storage of hazardous waste at a facility does not constitute "disposal" of hazardous waste."). In support of its argument, Raymond cites to the deposition testimony of Philip Rosen, in which Rosen testified that throughout the relevant time period that he purchased Raymond's scrap steel, he stockpiled that scrap at the Rosen site and resold that scrap to manufacturers for recycling. Thus, Raymond argues that the scrap steel was not "disposed of" at the Rosen site, but merely "stored" there prior to being resold by Rosen.

Raymond's reliance on the storage exclusion is misplaced. First, by its own admission, Raymond sold the scrap steel to the Rosens, which the Rosens then transported to the Rosen site for stockpiling. It is thus apparent that Raymond had an arrangement with the Rosens for the dumping of the scrap steel at the Rosen site under CERCLA. *See* 42 U.S.C. § 9607(a)(3); 42 U.S.C. § 6903(3). Second, this arrangement is not obviated by the fact that such scrap steel was resold by Rosen. There is no question that Raymond's purpose for entering into this arrangement was to remove the scrap steel from its property. Raymond has made no showing that it intended the scrap steel to be only temporarily "stored" at the Rosen site. The reality is that Raymond was not arranging with the Rosens for the mere temporary storage of the scrap steel, but rather was seeking to rid itself permanently of that scrap. Consequently, Raymond cannot avail itself to the defense of "storage" when, as here, another party simply resells the materials to others.

Raymond next argues that it did not "dispose" of the scrap steel because the SWDA and the regulations promulgated thereunder exempt materials that have been "recycled" from the definition of "disposed of" under CERCLA. Again, however, Raymond is wrong.

---

**8.** Before addressing the merits of the summary judgment motion, Raymond argues that the Court should not consider the affidavits of plaintiffs' expert witness, Roy O. Ball. According to Raymond, Ball's affidavits are without foundation and conclusory. In reply, plaintiffs sufficiently rebut Raymond's contentions, such that the Court has considered the Ball affidavits in connection with the present motion.

First, the so-called recycling exemption merely exempts certain materials from the definition of solid waste. It does not, as Raymond asserts, expressly exempt materials from the definition of "disposed of" under CERCLA. Second, although a persons' conduct may not fall within the meaning of "disposed of" under CERCLA when that person recycles materials, it does not necessarily follow that in this case Raymond did not "dispose of" the scrap steel. In this case, Raymond did, in fact, arrange for the disposal of its scrap steel with Rosen. It did not, as Raymond asserts, arrange for the scrap steel to be recycled.

Raymond also appears to intertwine the so-called "useful product" defense with its recycling argument. This defense provides that "CERCLA liability may not attach if a transaction involves the sale of a new useful product containing a hazardous substance, as opposed to the sale of a substance merely to 'get rid of it.'" *Chesapeake & Potomac Tele. Co. v. Peck Iron & Metal Co.*, 814 F.Supp. 1269, 1275 (E.D.Va.1992) (citing *Prudential Ins. Co. v. United States Gypsum*, 711 F.Supp. 1244, 1254 (D.N.J.1989)). In this case, however, regardless of the fact that the scrap steel may have been reclaimed or recycled, there is no doubt that Raymond contracted with the Rosens merely to "get rid of [the steel scrap]." *See State of New York v. General Elec. Co.*, 592 F.Supp. 291, 297 (N.D.N.Y.1984) (rejecting an argument similar to the present defendant's and noting that "a waste generator's liability under CERCLA is not to be so facilely circumvented by its characterization of its arrangements as sales").

Having established that Raymond disposed of the steel scrap at the Rosen site, plaintiffs next must show that the steel scrap contained CERCLA listed hazardous substances. Under CERCLA:

[t]he term "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14). This definition consolidates a number of lists of hazardous materials and allows the EPA to add further substances to the list pursuant to 42 U.S.C. § 9602. *United States v. Serafini*, 750 F.Supp. 168, 170 (M.D.Pa.1990).

In this case, Raymond admits that steel was taken to the Rosen site. Moreover, according to the plaintiffs, steel of the specifications discarded by Raymond contain the hazardous substances manganese, or other hazardous substances. In a Memorandum–Decision & Order dated August 25, 1995, this Court held that steel may be considered a manganese compound so long as it contains some amount of manganese, and thus may be found hazardous for CERCLA purposes. Here, plaintiffs' expert has identified manganese in the type of steel discarded by Raymond. Applying the doctrine of the law of the case, the Court finds that the scrap steel is hazardous under CERCLA.

Lastly, plaintiffs also have met their burden of showing that the hazardous substances found in Raymond's waste were identified at the Rosen site. The Remedial Investigation Report establishes that the hazardous substances found in Raymond's waste also were identified at the Rosen site.

Accordingly, because there is no material question of fact as to CERCLA liability involving the dumping of scrap steel by Raymond at the Rosen site, summary judgment is granted in favor of the plaintiffs on the issue of liability.

### ii) Scrap Aluminum

■ Plaintiffs also seek to impose liability against Raymond for the alleged dumping of scrap aluminum at the Rosen site. As evidence of this claim, plaintiffs cite to Raymond's admission that its manufacturing process resulted in scrap aluminum waste, the testimony of Raymond's employees that Raymond's manufacturing process generated scrap aluminum and the testimony of Philip Rosen that it disposed of Raymond's scrap aluminum at the Rosen site. Plaintiffs also cite to Raymond's verified 104(e) response to the EPA's request for information. In that response, Raymond admitted that the Rosen Brothers hauled away Raymond's scrap aluminum to the Rosen site. This evidence is sufficient to satisfy plaintiffs' burden of showing that aluminum scrap was "disposed of" at the Rosen site.

In rebuttal, Raymond asserts that it did not dispose of aluminum at the Rosen site. To support its position, Raymond cites the Court to the affidavit of a mechanical engineer employed by Raymond, Herbert Powell. In that affidavit, Powell states that Raymond always separated the scrap steel from the scrap aluminum. Powell also states that at no time was the scrap aluminum taken away by Rosen to the Rosen site; instead, he states that it was sold to others.

Raymond also asserts in rebuttal that the plaintiffs' reliance on Raymond's 104(e) response is misplaced, as Raymond corrected that erroneous admission by letter to the EPA in 1994. As evidence, Raymond submits the affidavit of its Executive Vice–President, William Lynn (attached with a copy of the 1994 letter to the EPA), explaining that Raymond did not send scrap aluminum to the Rosen cite.

In reply, plaintiffs' argue to strike both the Powell and Lynn affidavits. The Court agrees that certain parts of both affidavits should not be considered, and that consequently, the affidavits do not suffice to raise a question of fact whether Raymond "disposed of" scrap aluminum at the Rosen site.

■ Turning first to the Powell affidavit, that affidavit fails to satisfy Rule 56(e)'s requirement that the affiant possess personal knowledge as to the matters averred, and to "show affirmatively that the affiant is competent to testify to the matters stated therein." *See* Fed.R.Civ.P. 56(e); *Union Ins. Society of Canton, Ltd. v. William Gluckin & Co.,* 353 F.2d 946, 952 (2d Cir.1965). Although Powell states in his affidavit that the Rosen Brothers never hauled away Raymond's scrap aluminum, that statement is not supported by any elucidation as to how Powell possessed such first-hand personal knowledge. Notably, the affidavit does not explain, as required by Rule 56(e), how Powell had any personal knowledge as to the arrangement between Raymond and the Rosen Brothers, nor how his duties as an engineer deposited such personal knowledge. Instead, the affidavit baldly asserts that all statements made are based upon personal knowledge acquired throughout the course of employment. This is insufficient to satisfy Rule 56(e)'s requirements.

■ With respect to the Lynn affidavit, the Court finds that this affidavit also fails to raise an issue of material fact whether Raymond dumped scrap aluminum at the Rosen site. In that affidavit, Lynn states that in response to a request for additional information, Raymond submitted a letter to the EPA stating that it did not dispose of scrap aluminum at the Rosen site. Raymond thus argues that this affidavit shows or at the least raises a question of fact as to whether Raymond sent scrap aluminum to the Rosen site.

This argument, however, suffers from a fatal flaw. That is, Lynn does not claim in his affidavit to possess any first-hand knowledge either of Raymond's relationship with the Rosens or how Raymond disposed of the scrap aluminum. Although a letter may have been sent to the EPA, Lynn does not assert personal knowledge as to the statements contained in that letter concerning Raymond's relationship with the Rosen Brothers. In fact, although Lynn signed that letter, the statements therein were based upon the de-

position testimony of Raymond employees and Raymond's ordinary business records. Accordingly, the Court also concludes that the Lynn affidavit cannot raise an issue of material fact involving the dumping of the scrap aluminum at the Rosen site.

▉ Finally, plaintiffs' expert establishes that all known grades of aluminum used in Raymond's manufacturing process contained CERCLA listed hazardous substances. Further, the remediation report shows that the hazardous substances found in Raymond's scrap aluminum were identified at the Rosen site.

Accordingly, because there is no material question of fact as to CERCLA liability involving the dumping by Raymond of scrap aluminum at the Rosen site, summary judgment is granted in favor of the plaintiffs.

### b) Divisibility

▉ Although CERCLA is a strict liability statute that imposes joint and several liability on polluters in most instances, the Second Circuit has limited the potential harsh scope of CERCLA liability by adding "a common law gloss to the statutory framework." *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 721 (2d Cir.1993). Consequently, although joint and several liability has been imposed against Raymond for response costs at the Rosen site, Raymond may nonetheless escape liability for the costs of remediation by showing either that its scrap steel and scrap aluminum "did not contribute to the release and the clean-up costs that followed, or contributed at most to only a divisible portion of the harm." *Alcan*, 990 F.2d at 722 (citation omitted). However, Raymond as the polluter bears the burden of establishing divisibility. *Id.*

▉ As explained in *Alcan*, "causation is being brought back into the case—through the backdoor, after being denied entry at the frontdoor—at the apportionment state." *Alcan*, 990 F.2d at 722; *see also Acushnet Co. v. Coaters Inc.*, 937 F.Supp. 988, 998 (D.Mass.1996) (referring to approach as "complex burden shifting framework"). Nonetheless, causation "is reintroduced only to permit a defendant to escape payment where its pollutants did not contribute more

than background contamination and also cannot concentrate." *Alcan*, 990 F.2d at 722. It also is important to note that as a strict liability statute, if the defendant fails to prevail on the divisibility argument as to any particular CERCLA hazardous substance, it is jointly and severally liable for the entire response cost. *See U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir.1992).

In the present case, Raymond argues that joint and several liability cannot be imposed before it is given the opportunity to show that the harm caused at the Rosen site is divisible. This argument misunderstands CERCLA.

As a defendant in a cost recovery action, Raymond bears the burden of establishing divisibility. *See, e.g., Alcan*, 990 F.2d at 722. Here, Raymond has been found to be jointly and severally liable under § 107(a). To avoid joint and several liability, Raymond must affirmatively set forth evidence to show that the harm caused is divisible. Raymond cannot, as it asserts, avoid joint and several liability simply because it has yet to elect to show divisibility. Rather, the Court will revisit the divisibility issue, and thus the scope of Raymond's liability, if and when Raymond decides to set forth affirmative evidence as to divisibility. Because Raymond has not fully addressed the issue in its papers, the Court reserves decision on the issue of divisibility. *See Alcan*, 990 F.2d at 723 (stating district courts have discretion when to address divisibility issue); *see also* John M. Hyson, *"Fairness" and Joint and Several Liability in Government Cost Recovery Actions under CERCLA*, 1 HARV. ENVTL. L. REV. 137, 176 (1997) (recognizing three distinct questions: liability, scope of liability and allocation).

### III. CONCLUSION

For the reasons stated above, certification is GRANTED with respect to the Court's Memorandum–Decision & Orders of February 27, 1997 and April 17, 1997. Further, plaintiffs' motion for summary judgment is GRANTED against Raymond on the issue of liability for response costs at the Rosen site. The Court RESERVES decision on the issue of divisibility of harm under 107(a). Lastly, Raymond's cross-motion to dismiss the plain-

tiffs' CERCLA claims is DENIED in its entirety, and further, Raymond's motion to dismiss plaintiffs' state law claims is GRANTED IN PART and DENIED IN PART, to the extent stated herein.

**IT IS SO ORDERED.**